GARNET MINE, LLC, Plaintiff,

v.

Lewis J. BRANDOLINI, III., et al., Defendants.

No. Civ.A. 01–2697.

United States District Court, E.D. Pennsylvania.

June 13, 2001.

Michael Sklaroff, Allan M. Hoffman, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, PA, for Plaintiff.

Michael O'Hayer, Crawford, Wilson, Ryan & Agulnick, PC, Robert A. Silverman, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, Peter J. Rohana, Jr., Solicitor, Township of Ridley, Media, PA, Howard Finkelman, Bock & Finkelman, Philadelphia, PA, for Defendants.

*MEMORANDUM*

LOWELL A. REED, Jr., Senior District Judge.

This is the case of a complex multi-million real estate development transaction gone awry. Presently before this Court is the motion of plaintiff Garnet Mine, LLC ("Garnet Mine") for a temporary restraining order and preliminary injunction (Document No. 2) pursuant to Federal Rule of Civil Procedure 65. For the reasons that follow, plaintiff's request will be denied.

*Background*

At the core of this case are two contiguous tracts of real property (the "property") totaling 75 acres and located in Bethel Township, Delaware County, Pennsylvania. Defendant Lewis Brandolini, III ("Brandolini") became equitable owner of the property pursuant to two separate agreements of sale with the Estate of Catherine A. McLaughlin, by its Executrix, Catherine H. McLaughlin, and the Estate of Edward D. McLaughlin and Mary Louise McLaughlin (the "McLaughlin Agreements"). Pursuant to the McLaughlin Agreements, Brandolini submitted to Bethel Township for approval certain final subdivision plans for residential development prepared on his behalf by Brandywine Valley Engineers ("BVE"). Under the BVE plans, the property was divided into 200 separate residential dwelling lots for some single houses and some semi-detached "twin" houses.[1] Eventually, these lots were divided into four separate sections. Garnet Mine later expressed the desire to change the "twin" homes into townhomes.

On or about August 10, 1999, Brandolini and Garnet Mine entered into a detailed Agreement of Sale (the "August 1999 Agreement" or the "Agreement") for lots 1

---

**1.** One lot is to be retained by Mary Louise McLaughlin.

through 94 and lots 96 through 143, which encompassed sections 2, 3 and 4 of the property for the purchase price of $4,473,000. The August 1999 Agreement also included a Right of First Opportunity which Garnet Mine could exercise on section 1 of the property. (Pl.'s Ex. 1 at ¶ 15.16.) The Agreement reads in relevant part:

Buyer [Garnet Mine] shall have a twenty day period commencing on September 1, 1999 within which to negotiate with Seller [Brandolini] for the purchase and sale of those lots that are part of the Estate Property but are not part of the Buyer's Property as defined in this Agreement (hereinafter, the "Seller's Lots").... If Seller is willing to negotiate, then Buyer must submit an offer to purchase Seller's Lots within the applicable twenty day period. Provided Buyer does so, within five days of receiving such offer *Seller shall either accept it, or shall make a counter-offer, or shall describe the basis upon which Buyer is invited to submit an acceptable offer.*

(*Id.*)[2] (emphasis added). Extension dates were later incorporated by way of amendments to the Agreement, and parties ultimately decided set a November 12, 1999 deadline by which Seller was to accept Buyer's offer. (Pl.'s Ex. 3 at ¶ C.)

On or about October 20, 1999, Jay Sonecha ("Sonecha"), on behalf of Garnet Mine, made the following written offer by letter, provided in relevant part, for the purchase of the section 1 lots:

(i) $55,000 for each single family detached lot, and

(ii) $31,500 for each semi detached lot

for a total consideration of $2,148,000; subject to the same terms and conditions as established in the Contract for our purchase from you of the Buyer's Lots

comprising the McLaughlin Property, but with the appropriate adaptions to take into account the fact that, as purchaser of all the lots comprising the McLaughlin Property, certain conditions for our benefit, and certain retained rights for your benefit, would either become unnecessary or require modification.

(Pl.'s Ex. 4.) On October 27, 1999, Frederick Snow ("Snow"), on behalf of Brandolini, faxed a copy of the offer back to Sonecha with the following note handwritten in the corner:

This is okay subject to acceptable changes to existing Agreement of Sale and based on one settlement for all the lots including the 142 Lots currently under contract.

(*Id.*) On October 12, 1999, Snow sent a letter to Sonecha stating in relevant part:

This is to confirm that we have agreed that you would receive a credit of $120,000 at the closing for the entire 184 Twins/Towns and 15 Singles. I would request that your additional deposit of $150,000 be increased to $250,000 to reflect the change in the entire contract amount. In addition we would like the entire deposit released now to the seller and credited at the closing.

We may need to adjust the current Agreement of Sale to insure favorable tax treatment for us. Also, we agreed that if there were any errors in the actual topography versus Brandywine Engineer's plans than we would be responsible for any additional dirt costs relating to those errors. Please let me know if you want us to prepare an amendment to the current Agreement reflecting the changes.

(Pl.'s Ex. 5.)

On May 23, 2001, counsel for Brandolini sent counsel for Garnet Mine a Notice of

---

2. Seller's Lots equate to section 1 of the property.

Default regarding settlement on the purchase of sections 2, 3 and 4 of the property and calculating that settlement was to occur on June 4, 2001. Garnet Mine subsequently filed this motion for a temporary restraining order and preliminary injunction on June 1, 2001. Garnet Mine contends that there is a binding contract for the sale of *all* sections of the property and that Brandolini has not performed all his duties under the August 1999 Agreement and therefor lacked authority to force settlement on June 4, 2001. Plaintiffs seek a wide range of relief, including enjoining and restraining Brandolini from forcing Garnet Mine to settle on less than all of the sections of the property and without satisfaction of all of Brandolini's obligations. This Court heard evidence on the motion at a hearing which occurred June 5th, 6th, and 8th, 2001, during which the parties presented the testimony of a number of witnesses, most notably Sonecha and Snow, and submitted numerous documents. Oral arguments on the motion were presented on the final day of the hearing.

*Analysis*[3]

▉▉▉ I begin my analysis with a recitation of the familiar four considerations that must be taken into account in assessing whether a preliminary injunction should be granted:

(1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably harmed by denial of the relief; (3) whether granting preliminary relief will result in even greater harm to

the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest.

*ACLU v. Reno,* 217 F.3d 162, 172 (3d Cir.2000) (quoting *Allegheny Energy, Inc. v. DQE, Inc.,* 171 F.3d 153, 158 (3d Cir. 1999)). Issuing a preliminary injunction is an " 'extraordinary remedy' " and should be restricted to " 'limited circumstances.' " *Moscony v. Quaker Farms, LP,* No. Civ. A. 00–2285, 2000 WL 1801853, at *1 (E.D.Pa. Dec.8, 2000) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir.1989)). A district court should endeavor to balance these four factors to determine whether an injunction should issue. *See BP Chemicals Ltd. v. Formosa Chemical & Fibre Corp.,* 229 F.3d 254, 263 (3d Cir.2000). All four factors must weigh in favor of granting the preliminary injunctions. *See Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 803 (3d Cir.1998). The moving party clearly bears the burden in proving that all elements required for a preliminary injunction are met. *See Adams v. Freedom Forge Corp.,* 204 F.3d 475, 486 (3d Cir.2000).

**1. Reasonable Probability of Success on the Merits**

Plaintiff's likelihood of success on the merits turns on whether it has brought forward substantial evidence that a contract for the sale of *all* sections of the property existed. The Court of Appeals for the Third Circuit has had occasion in the recent past to lay out the law of contract formation in Pennsylvania, observing

---

**3.** Because this action arose between parties who are citizens of different states and the amount in controversy exceeds $75,000, this Court has subject matter jurisdiction under 28 U.S.C. § 1332. In order to determine the substantive law to apply in this case, this Court is guided by the conflict of laws rules of the forum state, Pennsylvania. *See Kirschb-*

*aum v. WRGSB Assoc.,* 243 F.3d 145, 150–51 (3d Cir.2001). Pennsylvania uses a hybrid approach to conflict of laws analysis which encompasses both the "government interest" and the "significant relationship" tests. *See id.* at 151. The parties agree that Pennsylvania substantive law governs this case; I do not disagree.

that: "It is by now hornbook law that 'the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced.'" *ATACS Corp. v. Trans World Communications, Inc.,* 155 F.3d 659, 665 (3d Cir.1998) (citing *Channel Home Ctrs. v. Grossman,* 795 F.2d 291, 298–99 (3d Cir.1986) (citing *Lombardo v. Gasparini Excavating Co.,* 385 Pa. 388, 123 A.2d 663, 666 (1956); *Linnet v. Hitchcock,* 324 Pa.Super. 209, 471 A.2d 537, 540 (1984))). Consideration is also obviously a required element of contract formation. *See id.* (citing *Channel Home Ctrs.,* 795 F.2d at 299).

The essential inquiry is the "'manifestation of assent of the parties to the terms of the promise and to the consideration for it....'" *Id.* at 666 (citing 1 Samuel Williston, *A Treatise on the Law of Contracts* §§ 23, at 51 (Walter H.E. Jaeger ed., 3d ed.1957); *Restatement (Second) of Contracts* §§ 22 (1981)). *See also Mazzella v. Koken,* 559 Pa. 216, 739 A.2d 531 (1999) ("it is essential to the enforceability of a [contract] that 'the minds of the parties should meet upon all the terms'") (quoting *Onyx Oils & Resins, Inc. v. Moss,* 367 Pa. 416, 420, 80 A.2d 815, 817 (1951)).

■■■ It has been noted that the essential terms of a contract for land are "the naming of the specific parties, property and consideration or purchase price." *GMH Assoc., Inc. v. Prudential Realty Group, CB,* 2000 Pa.Super. 59, 752 A.2d 889, 900 (2000) (citing *Detwiler v. Capone,* 357 Pa. 495, 502, 55 A.2d 380, 385 (1947)). Where an informal contract is in issue, parties should assent to all terms, and

"'[i]f anything is left open for future [negotiation], the informal paper cannot form the basis of a binding contract.'" *Id.* (quoting *Isenbergh v. Fleisher,* 188 Pa.Super. 99, 145 A.2d 903, 907 (1958)) (change in original).

■■■ Thus, Pennsylvania contract formation law is governed by the following inquiries: "(1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration." *ATACS Corp.,* 155 F.3d at 666 (citing *Channel Home Ctrs.,* 795 F.2d at 299; *Johnston the Florist, Inc. v. TEDCO Constr. Corp.,* 441 Pa.Super. 281, 657 A.2d 511, 516 (1995)). When conflicting evidence abounds as to whether parties intended to make a binding contract, the intent of the parties is a question of fact for a jury to decide. *See Mazzella,* 739 A.2d at 536.

In the instant case, parties agree that the August 1999 Agreement constitutes a binding contract for the sale of sections 2, 3 and 4 of the property and includes a right of first opportunity for plaintiff to buy section 1 of the property from Brandolini. (Pl.'s Ex. 1.) Snow testified that he believed Garnet Mine began the process of exercising that right by making an offer on or about October 20, 1999, through the letter Sonecha sent on behalf of Garnet Mine to Brandolini. (Pl.'s Ex. 4.) The fact that an offer had been made is further evidenced in the Second Amendment to Agreement of Sale. (Pl.'s Ex. 3 at ¶ B.)[4] Thus, the evidence of record clearly shows that an offer for the sale of section 1 land was made.

4. The Amendment reads: "The Agreement also contemplates a 20 day period ending October 20, 1999, during which Buyer would have the Right of First Opportunity to negotiate for the purchase of certain additional real property from Seller, referred to in the Agreement as Seller's Lots, and to tender an offer to purchase the Seller's Lots, *which Buyer has done."* (Pl.'s Ex. 3 at ¶ B) (emphasis added).

■ In contrast, the evidence concerning an acceptance or assent by the parties is quite muddied. As detailed above, Snow wrote: "This is okay subject to *acceptable changes* to existing Agreement of Sale and based on one settlement for all the lots including the 142 Lots currently under contract." [5] (Pl.'s Ex. 4) (emphasis added). Under the terms of ¶ 15.16 of the August 1999 Agreement, the parties contemplated that Brandolini would respond to the offer to buy section 1 in one of three ways: accept it, make a counter-offer, or "describe the basis upon which Buyer is invited to submit an acceptable offer." (Pl.'s Ex. 1 at ¶ 15.16.) Snow testified that his handwritten response on October 27, 1999, was an invitation for Garnet Mine to submit an acceptable offer.

Sonecha testified as follows: The term "appropriate adaptions" in the offer letter referred only to changes which would be necessary to reflect the fact that Garnet Mine was now going to purchase all of the lots. He and Snow spoke between the time the offer was made on October 20, 1999, and the time that Snow responded by handwritten notation on October 27, 1999. Based in part on those conversations, Sonecha believed that such changes would be limited to the elimination of the need for Homeowners Association documents and certain site work responsibilities. This testimony appears weak in the face of Snow's testimony that he did not

recall any conversations between himself and Sonecha between October 20, 1999, and October 27, 1999. Most important is Snow's testimony concerning his confusion about the terms of the offer and the following three unresolved issues between the parties which would impact the cost of the section 1 property and the deal as a whole if it were to include all four sections.[6]

First, Snow testified regarding PECO offsite gas and onsite design issues as follows: Under the August 1999 Agreement, the parties contemplated a co-development plan whereby Brandolini would develop section 1 and Garnet Mine would develop the remaining sections. The installation for the gas main was quoted by PECO at over $248,000, and a portion would need to be paid pack to PECO if the developer failed to build all 199 anticipated units. Under the August 1999 Agreement, Brandolini was to pay this potential liability. Thus, if Garnet Mine was to become the sole developer of the lots, a term up for negotiation would be who would bear the liability to PECO if all units were not built. The evidence presented by Garnet Mine fails to convince this Court that this is not a valid issue brought forth by Brandolini as unresolved on October 27, 1999.

Second, Snow testified as follows concerning the abandoned pipelines formerly used by gas transmission companies which lie in part in section 1 of the property.

5. Brandolini argues that Snow was not acting as an agent for Brandolini and was not authorized to bind Brandolini. Thus, even if this Court were to believe that the language in this exchange amounts to a reasonable likelihood that Garnet Mine would prevail in demonstrating that a contract was formed, Snow cannot bind Brandolini to any contractual duties. While this Court finds this argument somewhat dubious in light of the evidence presented at the hearing, my decision today will not address the merits of this argument since I conclude that language in the documents and the surrounding circumstances are dispositive of the issue of whether plaintiff would likely prevail on the merits of its claim.

6. Brandolini produced evidence showing a number of additional unresolved issues as of October 27, 1999, including further development costs, improvements to Mary McLaughlin's retained lot, the expense of redrafting planning documents, and a tax relief proposal by plaintiff, for examples. I detail in the text the three issues which seem to loom the largest.

The pipelines sit within easements granted to the gas transmission companies which formerly used them and currently the unused pipelines lie in portions of the property where construction is necessary. The pipeline companies were unwilling to give up their easements; thus, in order to develop the land, the easements and the piping needed to be moved or removed. Accordingly, the cost of that work was also unresolved on October 27, 1999. As well, there was no agreement as to who would assume liability for indemnity to the pipeline owner for the environmental impact of moving the piping. Again, Garnet Mine did not produce sufficient evidence which would eliminate this issue.

Third, parties agree that the original plans by Brandywine Valley Engineers were inaccurate with respect to topographic information, and that the error has created the need for excess dirt removal. Sonecha testified that, as evidenced by the November 12, 1999 letter, Brandolini agreed to pay for all removal costs which total approximately $500,000. Snow testified, however, that Brandolini only agreed to pay for the reasonable allocation of dirt cost due to the engineering error which would reduce the claim substantially. Thus, the evidence paints very conflicting pictures regarding who shall bear what costs for removing the excess dirt.

Plaintiff also argues that even if Snow's October 27, 1999 note did not constitute an acceptance, the November 12, 1999 letter written from Snow to Sonecha, evidences a valid and enforceable contract. Specifically, Garnet Mine proposes that the statement, *"This is to confirm that we have agreed* that you would receive a credit of $120,000 at the closing *for the entire* 184 Twins/Towns and 15 Singles."* (Pl.'s Ex. 5) (emphasis in Pl.'s Supp.Br.), indicates an acceptance on the part of Brandolini. This argument is unconvincing as a defini-

tive statement. As Brandolini argues, the letter also requests an additional deposit (which a sophisticated land developer such as Sonecha might well expect when the sale price has significantly increased) and which Garnet Mine never agreed to make and did not make. Thus, it can be argued with equal force that this letter merely constituted further negotiations.

Garnet Mine has not met its burden of convincing me that it has a reasonable likelihood of success on the merits of its contention that a contract existed for the sale of all sections of the property. I conclude that at best, the evidence is in equipoise, and that plaintiff has not shown a likelihood of success in its favor at this time. The abundance of evidence shows to this Court that plaintiff has not met its burden that it is reasonably likely that there was a meeting of the minds as to the terms which would govern a deal to encompass the section 1 property. Rather, the evidence suggests and I find that the exchanges between the parties tend to show that they both anticipated a formal agreement which would settle all outstanding issues. While some basic terms were included in the offer, the consideration was not sufficiently definitive for plaintiff to meet its burden in light of the evidence of record; the final resolution of costly unresolved matters, including, *inter alia*, the gas main issue, the easement issue, and the dirt removal issue, would greatly change the ultimate sale price. The evidence shows that the parties exchanged many draft agreements and had many negotiation sessions but no overall agreement was ever reached.

As the testimony indicated, and as the August 1999 Agreement demonstrates, both parties involved in this multi-million development deal are quite sophisticated and expect detailed documents in such complex transactions. The record shows

that players of this caliber intended to formalize many expensive "details" which appear to remain unresolved on the evidence of record to date. Indeed, a jury could easily decide on this record that in light of the detail accompanying the August 1999 Agreement (which by the terms of ¶ 15.16 bargained for back and forth negotiations in the context of exercising the right of first opportunity) neither party would reasonably expect that a transaction for all the sections would simply be handled under the same terms and conditions of the original agreement as plaintiff contends.

Garnet Mine also moves this Court to enjoin and restrain Brandolini from forcing immediate settlement. Plaintiff contends that Brandolini cannot move for settlement because he has failed to meet his obligations under the August 1999 Agreement. For instance, plaintiff argues that Brandolini cannot at this time meet his duty to provide sanitary sewer under the terms of the August 1999 Agreement. (Pl.'s Mem. of Law at 12; Pl.'s Ex. 1 at ¶ 6.12.) Because plaintiff has moved this Court only to enjoin settlement as to the *whole* property, and because I conclude that plaintiff has failed to meet its burden in demonstrating the likelihood that it would prevail on the key issue of whether there is a binding contract to purchase the *whole* property, I conclude that it is unnecessary to address whether it is reasonably likely that Garnet Mine would succeed on the merits of its contention that Brandolini has not met its obligation under the contract.

## 2. Irreparable Harm

■ Even if Garnet Mine were able to meet its burden with respect to the reasonable likelihood of success inquiry, for the following reasons, I conclude that plaintiff would not be able to meet the irreparable harm burden. To make a showing of irreparable harm, " 'plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy following a trial. The preliminary injunction must be the *only* way of protecting the plaintiff from harm.' " *Campbell Soup Co. v. ConAgra, Inc.,* 977 F.2d 86, 91 (3d Cir.1992) (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 801 (3d Cir.1989)) (emphasis in original). The " 'requisite feared injury or harm must be irreparable—not merely serious or substantial,' and it 'must be of a peculiar nature, so that compensation in money cannot atone for it.' " *Id.* (quoting *ECRI v. McGraw–Hill, Inc.,* 809 F.2d 223, 226 (3d Cir.1987)). *See also KP First Ave., L.P. v. Prentiss Properties Acquisition Partners, L.P.,* No. Civ. A. 01–1396, 2001 WL 438416, at *5 (E.D.Pa. Apr.26, 2001) (finding no *per se* rule of irreparable harm in cases involving an injury to an interest in land within this Circuit). Thus the question is whether money damages could make Garnet Mine whole if it could not purchase *all* sections of the property.

■ Garnet Mine contends in a very conclusory manner that it would be irreparably harmed by having to develop sections 2, 3 and 4 without section 1 because the sections are more valuable as an entirety than separate.[7] Plaintiff also argues that Brandolini is forcing settlement on

---

7. In addition, plaintiff contends that it faces the risk that Brandolini will allow his right to acquire the property to expire. Counsel for the McLaughlin defendants were present at the hearing and all defendants represented to this Court in the presence of counsel for the plaintiff that Brandolini and the McLaughlins have not let, and do not plan to let, Brandolini's rights to acquire the property expire. Thus, I conclude that Garnet Mine is not in danger of this harm.

sections 2, 3, and 4 in order to carry out his threat to convey section 1 to a third party. However, Garnet Mine failed to produce any evidence that Brandolini had such intentions.[8] In addition, Garnet Mine argues that it had the final plans for the property changed because it was acting under the belief that plaintiff was to purchase the whole property. Garnet Mine believes that under the final plans it would be unable to commence the development of sections 2, 3 and 4. Again, Garnet Mine never provided evidence that it cannot develop without section 1. Presumably, when parties signed the August 1999 agreement, they planned to co-develop the land under one final plan. This Court is not convinced that such an arrangement is not possible under the new plans.

I conclude that the most the evidence demonstrates is that without section 1, Garnet Mine faces the distinct possibility of a loss of economic opportunity to achieve maximum profits. I conclude further that such injury can be compensated by monetary damages, even if the damages are difficult to prove.[9]

### Conclusion

I have concluded that plaintiff has not met its burden of proof on the two most important considerations on a preliminary injunction: the likelihood of success of the merits and irreparable harm. Since plaintiff must make a showing of all four factors, and has failed to prove the first two factors for consideration, I will not address the merits of the remaining factors, namely, balancing the hardships and public interests. In sum, plaintiffs asked this Court to become snarled in a bitter dispute over a complex land deal, and I conclude that this bitter dispute remains for resolution as the case develops.

Accordingly, for the foregoing reasons, the motion for preliminary injunction will be denied. An appropriate Order follows.

### ORDER

**AND NOW,** this 13th day of June, 2001, upon consideration of the motion of plaintiff for a temporary restraining order and preliminary injunction (Document No. 2), pursuant to Federal Rule of Civil Procedure 65, and having held a hearing on June 5th, 6th, and 8th, 2001 at which the parties offered evidence, presented testimony, and this Court heard oral arguments on, and having concluded, for the reasons set forth in the foregoing memorandum, that plaintiff has not met its burden of establishing a reasonable likelihood of success or irreparable harm, and that a temporary restraining order and preliminary injunction is therefore not warranted under on the evidence now in the record, **IT IS HEREBY ORDERED** that the motion for preliminary injunction is **DENIED.**

---

8. In fact, before the hearing started settlement prospects appeared promising.

9. Garnet Mine also argues that it will be irreparably harmed by suffering a loss of goodwill if this Court does not grant injunctive relief. In support, plaintiff cites *Pappan Enter., Inc. v. Hardee's Food Sys., Inc.,* 143 F.3d 800, 805 (3d Cir.1998), which involved a claim for trademark infringement, and in which the Court of Appeals determined that the loss of goodwill serves as grounds for irreparable harm. Plaintiff, however, produced no evidence at the hearing to support its claim that a denial of injunctive relief would result in the loss of goodwill. In addition, plaintiff has failed to convince this Court that it was not performing at its own risk since it was unable to meet its burden of showing that is was reasonably likely that a contract for the sale of section 1 existed.