739 A.2d 531

Louis MAZZELLA, Appellant,

v.

M. Diane KOKEN, Insurance Commissioner of the Commonwealth of Pennsylvania as Statutory Liquidator of Colonial Assurance Company, Appellee.

Supreme Court of Pennsylvania.

Submitted June 9, 1999.

Decided Oct. 28, 1999.

David C. Franceski, Jr., Philadelphia, William E. Mahoney, Jr., Malvern, Stradley, Ronon, Stevens & Young, Philadelphia, for Louis Mazzella.

Kenneth A. Murphy, Miller, Alfano & Raspanti, Philadelphia, for M. Diane Koken, Ins. Comm.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

SAYLOR, Justice.

This is an appeal from an order of the Commonwealth Court granting an application to enforce a settlement agreement purportedly reached in the course of an insurance liquidation action. We conclude that the Commonwealth Court erred in finding that the parties had entered into an enforceable settlement agreement, and therefore reverse.

Appellant Louis Mazzella ("Mazzella") is the president and sole shareholder of Colonial Investment Company, which in turn is the sole shareholder of Colonial Assurance Company ("Colonial"). On March 28, 1984, the Commonwealth Court entered an order, to which Mazzella consented, liquidating Colonial pursuant to Article V of the Insurance Department Act (the Act), Act of May 17, 1921, P.L. 789, *as amended,* 40 P.S. §§ 221.1–221.63.[1]

During the course of post-liquidation proceedings, Mazzella filed two actions against the Insurance Commissioner in her capacity as Statutory Liquidator (the "Liquidator").[2] The first of these actions, commenced in 1991, sought to vacate or modify the liquidation order, or to terminate the proceeding, discharge the Liquidator, and distribute Colonial's assets. The second, commenced in 1993, was a mandamus action to compel the Liquidator to assert causes of action on behalf of Colonial against the Mercantile and General Reinsurance Company. Mazzella asserts that he brought these actions

1. Under Section 761(a)(3) of the Judicial Code, *as amended,* 42 Pa.C.S. § 761(a)(3), and Section 504(d) of the Act, 40 P.S. § 221.4(d), the Commonwealth Court has original jurisdiction over all actions arising under Article V. *Foster v. Westmoreland Cas. Co.,* 145 Pa.Cmwlth. 638, 641 n. 2, 604 A.2d 1131, 1132 n. 2 (1992).

2. M. Diane Koken currently serves as Insurance Commissioner. Her predecessors, Cynthia M. Maleski, Constance B. Foster, and Linda S. Kaiser, were also involved in the liquidation of Colonial.

because he believed that the Liquidator was not diligently working to recover assets for, and to reduce liabilities to, the Colonial estate.

On November 3, 1993, the Commonwealth Court directed the parties or their authorized representatives to appear at a settlement conference to be held on December 16, 1993. Counsel for the parties met on December 9, 1993, and apparently reached an agreement on general conditions of settlement. On December 15, 1993, the day before the scheduled conference, counsel for the Liquidator sent to Mazzella's counsel a letter memorializing those conditions and noting that on December 10, 1993, "you advised me that Louis Mazzella is comfortable with the proposed conditions." Those conditions were, *inter alia*, that Mazzella would withdraw his lawsuits against the Liquidator; that if Mazzella petitioned to intervene in "the Royal Bank objection matter,"[3] the Liquidator would not object; that if the assets of the Colonial estate proved sufficient to satisfy all claims against the estate that were properly filed and were accepted by the Liquidator, any surplus would be distributed to Mazzella; and that, "within a time-certain following resolution of the Royal Bank objection matter," the Liquidator would file a petition for distribution of Colonial's assets.

At the conference, counsel for Mazzella and the Liquidator informed the court that the parties had negotiated a settle-

3. The Royal Bank of Canada ("Royal Bank"), as a loss payee under a policy of insurance issued by Colonial to a third party, had filed a claim against Colonial in the amount of $2,013,236.04. In 1992, the Liquidator evaluated Royal Bank's claim at zero. Royal Bank filed objections to the Liquidator's evaluation, and the Liquidator filed a petition for a hearing in the Commonwealth Court. The matter was ultimately submitted to the court upon a stipulation of the issues and facts. By order entered December 20, 1993, the court granted Mazzella's request to intervene in the litigation. Although the Liquidator did not object to Mazzella's intervention, Royal Bank did, and the order permitting such intervention was rescinded. In 1995, the Commonwealth Court dismissed Royal Bank's objections, concluding that Royal Bank was not entitled to recover and, accordingly, that the Liquidator had properly evaluated Royal Bank's claim at zero. *See Foster v. Colonial Assur. Co.,* 668 A.2d 174 (Pa.Cmwlth.1995), *aff'd sub nom. Kaiser v. Colonial Assur. Co.,* 543 Pa. 626, 673 A.2d 922 (1996).

ment. The court directed counsel to submit a formal settlement agreement by January 18, 1994.

On January 13, 1994, Mazzella's counsel submitted to the Liquidator's counsel the draft of a settlement agreement conforming to the terms previously discussed. With regard to the distribution of the estate's assets, the draft agreement specified that "[w]ithin 60 days of the ultimate resolution by this Court [i.e., the Commonwealth Court] of the Royal Bank Claim, the [Insurance] Department shall file a Petition For Distribution Of Assets with this Court in docket 1984 C.D. 851...." Also included in the draft agreement, as one of several "whereas" clauses, was a statement that "the Department represents that a Balance Sheet for the estate of Colonial as of April 30, 1993 is a fair and accurate accounting of the assets and liabilities of the estate of Colonial as of said date." According to that balance sheet, Colonial's liabilities exceeded its assets by $531,443. Included among liabilities, however, was a reserve in the amount of $1,940,000 for the Royal Bank claim. If the court ultimately denied the claim, as proved to be the case, Colonial's assets would exceed its liabilities by approximately $1, 408, 000. The balance sheet noted that "[n]o reserve has been established for claims rejected by the [L]iquidator based on receipt subsequent to the January 1, 1991 bar date." [4]

On January 25, 1994, apparently having received no response, Mazzella's counsel wrote to counsel for the Liquidator, suggesting that they move expeditiously to file the agreement, the date by which the court had directed them to do so having already passed. One week later, Mazzella's counsel wrote to the court to explain that although the recent severe weather had hampered the parties' progress, they hoped to have an agreement on file within a few days.

4. The Act directs the Liquidator to specify, and to inform potential claimants of, a deadline by which claims must be filed, 40 P.S. § 221.24(b), but also permits the Liquidator to permit untimely claimants to share in distributions where doing so will not "prejudice the orderly administration of the liquidation," 40 P.S. § 221.37(b), (c).

In February of 1994, Liquidator's counsel made several revisions to the agreement and then returned it to Mazzella for his signature. One such revision concerned the distribution of assets, so that the pertinent paragraph read as follows:

> The Liquidator shall file a Petition For Distribution of Assets and Discharge of Liquidator with this Court in docket 1984 C.D. 851 referenced above, and as early as 60, but not later than 120 days after the ultimate resolution of the Royal Bank Claim *or any other remaining unresolved claim asserted against Colonial.*

(emphasis added). Another revision modified the "whereas clause" concerning the balance sheet so that it read "the Department represents that the Balance Sheet for the estate of Colonial as of April 30, 1993 accurately reflects the assets and liabilities of the estate *known to exist at that time*" (emphasis added).

Mazzella refused to execute the revised agreement. On March 25, 1994, the Liquidator filed an Application to Enforce Settlement Agreement in which she asserted, *inter alia,* the following:

> 32. As early as December 10, 1993, the Liquidator and Mazzella had agreed upon the essential terms of settlement of the pending [lawsuits].
>
> 33. Thereafter, the parties, through counsel, merely drafted and modified additional language to embellish the general conditions set forth in the December 10[th] Agreement.
>
> 34. Mazzella's refusal to execute the proposed final draft of the Settlement Agreement And Mutual Release does not denude the document of force and effect.
>
> 35. Under Pennsylvania law, the parties' proposed final draft of the Settlement Agreement And Mutual Release is mutually enforceable.

The "proposed final draft" was identified in the Application as the draft sent by the Liquidator's counsel to Mazzella's counsel on February 17, 1994.[5] In new matter accompanying his

---

5. Counsel for the Liquidator had also submitted a draft to Mazzella's counsel on or about February 8, 1994. Both February drafts contained

response, Mazzella asserted, *inter alia*, that the changes made to the agreement by the Liquidator were "both major and material" and, therefore, that the February draft did not embody a meeting of the minds between the parties.

Pursuant to a joint motion of the parties, the court entered an order in May of 1994 staying all proceedings on the Liquidator's application to enforce settlement until after the court's resolution of the Royal Bank claim. The claim was resolved in July of 1995, when the court accepted the Liquidator's valuation of zero. *See* footnote 3, *supra.*

In April of 1997, the court held a hearing on the application to enforce settlement. In a post-hearing submission, the Liquidator asserted the following:

> Through her Application To Enforce Settlement Agreement, the Liquidator seeks enforcement of the settlement reached between the parties in December 1993. Although Mr. Mazzella denies having agreed to the terms of any draft of the Settlement Agreement And Mutual Release generated after January 13, 1994, it is undisputed that both parties agreed to the terms set forth in the January 13, 1994 draft of the document. Accordingly, it is that version of the Settlement Agreement And Release that the Liquidator seeks to enforce.

Post–Hearing Memorandum in Support of Statutory Liquidator's Application at 3–4 (footnotes omitted). Acknowledging that the parties could no longer meet certain deadlines specified in the agreement, the Liquidator argued that the parties were nevertheless equitably bound to comply with the non-temporal terms of the agreement.

By order and unreported opinion filed December 29, 1998, the Commonwealth Court granted the Liquidator's application and directed the parties to comply with all of the terms of the settlement agreement that remained unsatisfied. Among its findings of fact, the court noted that Mazzella had admitted at

the revisions at issue; the revisions were worded identically in the two drafts, except for the omission in the earlier draft of the word "accurately" from the whereas clause concerning the balance sheet of April 30, 1993.

the evidentiary hearing that, prior to the settlement conference, he had received a letter from his counsel outlining the provisions of the proposed settlement; that he had agreed to those provisions; and that, after the settlement conference, his son and his counsel, both of whom had attended the conference, informed him "that they would get a formal settlement agreement and that it was consistent with the letter [that he had] received from his Counsel." From these and other facts, the court drew the following conclusions: Counsel for Mazzella had actual and express authority to enter into an agreement with the Liquidator on Mazzella's behalf, and did so at the December 1993 settlement conference. The terms agreed to at that time were formalized in the January 1994 settlement agreement, and any subsequent revisions to such agreement were non-material. Because counsel never negotiated for a dollar amount of surplus in the Colonial estate, Mazzella would not be heard to complain that the February revisions improperly foreclosed any possibility of a surplus. Moreover, "even if Mazzella objected to language inserted in the February 1994 draft, he cannot validly argue that the January 1994 draft is not binding and fully enforceable."

Mazzella appealed to this Court, asserting, *inter alia*, that "the real issue here is whether [he] and the Liquidator ever proceeded beyond a general 'agreement to agree' to a final, integrated agreement with respect to all material terms of the proposed settlement."[6] Mazzella contends that they did not, as shown by the changes made by the Liquidator to the January version of the agreement. According to Mazzella, these changes were not "insubstantial," as the Commonwealth Court found, but material, since they undercut the very basis

6. Mazzella also raises three additional issues: 1) Did he expressly or impliedly authorize his counsel to enter into a settlement agreement with the Liquidator on his behalf? 2) Should the January 1994 settlement agreement proposal be specifically enforced when performance of the agreement according to its terms has become impossible? 3) Should the January 1994 settlement proposal be specifically enforced when the Liquidator knowingly misled him as to the existence of additional claims against the Colonial estate, a material factor in his decision to settle? Given our disposition of Mazzella's first claim, we need not address these issues.

of his willingness to enter into a settlement: the understanding that, within a time certain after the resolution of one specific claim, the Liquidator would request that the assets remaining in the estate, if any, be distributed to him. Mazzella argues that, given the absence of an agreement, the draft prepared by his counsel in January was simply an offer, and the draft prepared by the Liquidator in February, since it was not identical to the January draft, was not an acceptance, but a counter-offer. *See Hedden v. Lupinsky*, 405 Pa. 609, 612, 176 A.2d 406, 408 (1962); *Yarnall v. Almy*, 703 A.2d 535, 539 (Pa.Super.1997). A counter-offer terminates the original offer, *see Yarnall*, 703 A.2d at 539, and therefore, Mazzella contends, the original (January) offer was no longer extant to be accepted by the Liquidator at a later date. Thus, he maintains, no enforceable settlement agreement exists.

The enforceability of settlement agreements is governed by principles of contract law. *McDonnell v. Ford Motor Co.*, 434 Pa.Super. 439, 445, 643 A.2d 1102, 1105 (1994) (quoting *Century Inn, Inc. v. Century Inn Realty, Inc.*, 358 Pa.Super. 53, 58, 516 A.2d 765, 767 (1986)), *appeal denied*, 539 Pa. 679, 652 A.2d 1324 (1994); *Miller v. Clay Township*, 124 Pa.Cmwlth. 252, 255–56, 555 A.2d 972, 974 (1989). To be enforceable, a settlement agreement must possess all of the elements of a valid contract. *Gogel v. Blazofsky*, 187 Pa.Super. 32, 36, 142 A.2d 313, 315 (1958) (citing *Sale v. Ambler*, 335 Pa. 165, 6 A.2d 519 (1939)). As with any contract, it is essential to the enforceability of a settlement agreement that "the minds of the parties should meet upon all the terms, as well as the subject-matter, of the [agreement]." *Onyx Oils & Resins, Inc. v. Moss*, 367 Pa. 416, 420, 80 A.2d 815, 817 (1951).

Where the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement. *Field v. Golden Triangle Broadcasting, Inc.*, 451 Pa. 410, 418, 305 A.2d 689, 693 (1973), *cert. denied*, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1974); *Goldman v. McShain*, 432 Pa. 61, 69, 247

A.2d 455, 459 (1968) (quoting RESTATEMENT OF CONTRACTS § 26); *Kazanjian v. New England Petroleum Corp.*, 332 Pa.Super. 1, 7, 480 A.2d 1153, 1157 (1984) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 27). Even the inability of the parties to an oral agreement to reduce such agreement to writing after several attempts does not necessarily preclude a finding that the oral agreement was enforceable. *See Woodbridge v. Hall*, 366 Pa. 46, 48, 76 A.2d 205, 206 (1950).

When there exists conflicting evidence as to whether the parties intended that a particular writing would constitute a complete expression of their agreement, the parties' intent is a question to be resolved by the finder of fact—in this case, the Commonwealth Court. *Field*, 451 Pa. at 414, 305 A.2d at 691. We will not reverse such finding unless it is unsupported by the evidence, or unless the fact finder has clearly abused its discretion or committed an error of law. *Id.* at 414, 305 A.2d at 692. In reviewing such finding, we are mindful that

[i]t is understandable [that] when, after a prolonged period of negotiations, parties appear to reach agreement on the essential terms of an important transaction, one of them might believe that a contract had been made. However, before preliminary negotiations ripen into contractual obligations, there must be manifested mutual assent to the terms of a bargain.

*Essner v. Shoemaker*, 393 Pa. 422, 425, 143 A.2d 364, 366 (1958). If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced. *Miller*, 124 Pa.Cmwlth. at 256, 555 A.2d at 974. If, however, there exist "ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce[,]" such an agreement must be set aside. *Id.*

In the present case, the Commonwealth Court concluded that in December of 1993 Mazzella and the Liquidator agreed upon all of the material terms of a settlement, which agreement was then reduced to writing in January of 1994. The court's desire to expedite the resolution of this 15–year–old litigation by enforcing such a settlement is understandable.

Nevertheless, its decision, based as it was on the conclusion that the revisions proposed by the Liquidator were "insubstantial," was an error of law.

The first change proposed by the Liquidator, as noted earlier, would have revised the "whereas clause" concerning the Balance Sheet of April 30, 1993, so that instead of describing the Balance Sheet as "a fair and accurate accounting of the assets and liabilities of the estate of Colonial as of said date," the agreement would aver that such Balance Sheet "accurately reflects the assets and liabilities of the estate *known to exist* at that time." According to Mazzella, the earlier version of the statement indicated that the Liquidator would entertain only those claims against the estate that were listed on the Balance Sheet, whereas the later version left open the consideration of additional claims.

Arguably the statement at issue, standing alone, is too ambiguous to possess the significance attributed to it by Mazzella. When both of the Liquidator's proposed revisions are viewed together, however, it is apparent that such revisions would work a substantial change to the agreement.

The January draft, as noted earlier, provided that the Liquidator would file a petition for distribution of assets within 60 days of the Commonwealth Court's resolution of one particular claim against the estate, that of the Royal Bank of Canada. The Liquidator acknowledges in her brief that "as of January 1994, the Royal Bank Claim stood as the only unresolved, fully documented claim that had the ability to negatively impact any potential surplus in the Colonial estate," and she maintains that she was fully prepared to exercise the discretion given her by the legislature "to reject any subsequent untimely filed claims on the grounds that consideration of such claims would affect the orderly distribution of assets." Thus, the January draft assured Mazzella that the Liquidator would initiate the distribution of the estate's assets within a time certain following a single, specified event. The certainty provided by the 60–day provision was obviously a substantial portion of the consideration demanded by Mazzella in return for his promise to withdraw his actions against the Liquidator.

No such certainty was provided by the February draft. To the contrary, the February draft stated that the Liquidator would file a petition for distribution of assets within 120 days of the Commonwealth Court's resolution of the Royal Bank claim "or any other remaining unresolved claim asserted against Colonial." This revision, if adopted, would have delayed indefinitely the filing of the petition for distribution, as such filing would have to await the resolution of an indeterminate number of claims. Because the Liquidator's proposed changes removed the degree of certainty that Mazzella had sought in the agreement, the changes went to the essence of the parties' bargain.

The Commonwealth Court minimized the importance of the Liquidator's proposed changes by asserting that Mazzella's counsel never negotiated for a specific dollar amount of surplus in the estate. The court's observation, while correct, misses the point: although Mazzella's counsel did not obtain the Liquidator's promise of a surplus, he did, under the January version of the agreement, obtain restrictions on the consideration of additional claims against the estate and thereby reduce the risk of financial liability to a level that was acceptable to Mazzella.[7] For the same reason, there is no merit to the Liquidator's argument that Mazzella's inherent knowledge of the policies written by Colonial negated any possibility that he was unaware of additional claims against the estate. The pertinent question is not whether Mazzella was aware of additional claims, but whether the Liquidator was prepared to entertain them. The January version of the agreement, drafted by Mazzella, provided one answer, while

7. Mazzella's desire to ensure a surplus was known to the Liquidator and the court. During a hearing on the Liquidator's preliminary objections to Mazzella's complaint in mandamus, counsel for the Liquidator informed the court (Silvestri, J.) that "[w]e have attempted several times to reach an agreement. The problem is that Mr. Mazzella has to have a certain comfort level, if you will. That is, . . . [t]here is a sum certain that has to be sitting in the estate's coffers before he's willing to enter into an agreement, and that is a problem." Counsel's comment was read into the record during the hearing before the court (Smith, J.) on the Liquidator's application to enforce settlement.

the February version, drafted by the Liquidator, provided another.[8]

In sum, the draft agreement sent by Mazzella to the Liquidator in January of 1994 was simply an offer, and the Liquidator's response, because it contained terms that varied from those of Mazzella's draft, was a counter-offer, the effect of which was to terminate the original offer. The parties did not reach an enforceable settlement agreement in December of 1993 or thereafter, since, as revealed by the January and February drafts, there was no meeting of the minds with regard to a material term of the proposed agreement.

Accordingly, the order of the Commonwealth Court directing enforcement of the purported agreement of January 1994 is reversed.

---

**8.** The Liquidator concedes that she has "compromised a number of additional claims," but maintains that she did so only after Mazzella "reneged" on the purported agreement. Once Mazzella reneged, the Liquidator contends, she could no longer "look to a date certain for windup of the estate because Mazzella soon recommenced his litigious behavior."