**CALIFORNIA SUN TANNING USA, INC., Appellant,**

v.

**ELECTRIC BEACH, INC.; Lee Carter; Staci Carter.**

No. 08–4843.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) Jan. 12, 2010.

Filed: March 11, 2010.

Albert M. Greto, Esq., Media, PA, for Appellant.

Alexander J. Chotkowski, Esq., John F. McKenna, Esq., William T. Wilson, Esq., Macelree Harvey, West Chester, PA, William M. McSwain, Esq., Drinker, Biddle & Reath, Philadelphia, PA, Patrick T. Henigan, Sr., Esq., Eckell, Sparks, Levy, Auerbach, Monte, Sloane, Matthews & Auslander, P.C., Media, PA, for Electric Beach, Inc.; Lee Carter; Staci Carter.

Before: AMBRO and CHAGARES, Circuit Judges, and JONES, District Judge.*

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

We consider in this appeal an order of the United States District Court for the Eastern District of Pennsylvania, granting a motion to enforce a putative settlement agreement. The appellant, California Sun Tanning, USA, Inc. ("California Sun"), asserts several related claims on appeal, but in essence it challenges the District Court's conclusion that a series of e-mails amongst the parties established an enforceable settlement agreement. Finding no error, we will affirm the District Court's order.

## I.

Because we write solely for the benefit of the parties, we will only briefly recite the essential facts. In 2003, California Sun and its principals, Michael and Tamera Hrycay, entered into a franchise agreement with appellees Electric Beach, Inc. ("Electric Beach") and its principals, Lee and Staci Carter.[1] Pursuant to the

---

1. Unless specifically stated otherwise, all references to Electric Beach include Lee Carter, and all references to California Sun include the Hrycays. At the time this action was

agreement, Electric Beach would operate a tanning salon at Trolley Square in Wilmington, Delaware, using California Sun's trade name and trademarks (the "Trolley Square Franchise"). In early 2007, Staci Carter contacted the Hrycays to report that her husband had manipulated the computer system at the franchise for the purpose of systematically underreporting revenues—and thereby commissions—to California Sun. California Sun estimated in its amended complaint that as a result of this manipulation, Lee Carter unlawfully underreported over $250,000 in gross revenues, and consequently caused it losses in excess of $50,000.

California Sun filed this action in November 2007, and amended its complaint in early December 2007. In the amended complaint, it requested injunctive and declaratory relief under the Lanham Act, seeking to preclude Electric Beach from further operating under California Sun's trade name and using its marks. California Sun also filed a separate arbitration action for damages, as was contemplated in the franchise agreement.[2] Although the original complaint invoked subject-matter jurisdiction solely under 28 U.S.C. § 1332, the amended complaint withdrew the parties' diverse citizenship as a jurisdictional basis, instead invoking federal-question and trademark jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338.[3]

Beginning in late December 2007 and continuing into January 2008, the parties engaged in settlement negotiations, largely via letter and e-mail. As originally proposed by California Sun, the parties would enter into an Asset Purchase Agreement ("APA"), whereby California Sun would purchase the Trolley Square Franchise (and related assets) from Electric Beach for $100,000 less expenses, and the parties would execute mutual releases of all claims against each other. Electric Beach Appendix ("E.B.App.") 323. By e-mail dated January 4, 2008, counsel for Electric Beach outlined the major points of agreement that had been reached during a discussion with counsel for California Sun. E.B.App. 329. Specifically, the agreed-upon purchase price had been decreased to $85,000, and all parties would execute the mutual general releases. *Id.* Additionally, the e-mail proposed that the agreement call for "[m]utual cooperation in the turnover" of the Trolley Square Franchise to the Hrycays, which would be completed by January 22, 2008. E.B.App. 329, 336. The e-mail stated that the agreement would be conditioned upon Staci Carter's acceptance. *Id.* Counsel for California Sun responded to this e-mail on January 7, 2008, stating under each point of agreement contained in the January 4 e-mail, "AGREED," although he included a number of minor conditions which were ultimately fulfilled. E.B.App. 333–34. Counsel for Staci Carter also responded that the agreement-in-principle was "[a]ll fine with Staci Carter." E.B.App. 335. California Sun agreed to circulate a draft APA promptly. E.B.App. 334, 347.

On January 8, 2008, counsel for California Sun informed the District Court by letter that "the parties have agreed in principal [sic] to amicably resolve their

---

filed, Lee and Staci Carter were separated and in the midst of divorce proceedings. Separate counsel represented Staci Carter in this matter, and she opposed the motion to enforce the settlement now under review (although she did not appeal the District Court's order). We therefore reference her separately.

2. When a settlement appeared imminent, the arbitration action was withdrawn.

3. The amended complaint also invoked supplemental jurisdiction under 28 U.S.C. § 1367 for the state-law claims alleged.

differences," and requested thirty days to reduce the agreement to writing and "consummate all aspects of that agreement." E.B.App. 338. Counsel also confirmed in an e-mail to Electric Beach that the District Court had been informed of the settlement. E.B.App. 341. On January 10, 2008, turnover of the Trolley Square Franchise commenced, as Tamera Hrycay began monitoring operations. E.B.App. 343, 400. California Sun ultimately assumed complete control of the franchise, and it entered into a new lease for the premises on February 13, 2008. E.B.App. 202–05. The $85,000 to be paid to Electric Beach— less outstanding rent, which was disbursed to the landlord—was deposited into an escrow account managed by counsel for California Sun pending execution of the APA. E.B.App. 202–03.

Meanwhile, during the January transition, California Sun alleges that it found the Trolley Square Franchise in disarray. Specifically, it claims that in anticipation of turning over control of the salon, Lee Carter had: (1) failed to satisfy substantial obligations (particularly rent, taxes, and certain utilities); (2) allowed the facilities to fall into disrepair (for instance, California Sun purchased a new air conditioning unit, claiming that the existing unit needed replacement); and (3) absconded with various assets and merchandise that were to be covered by the APA. California Sun demanded that Electric Beach defray the costs of resolving these issues by deducting them from the settlement funds held in escrow. *See* E.B.App. 348, 350, 358, 371, 431. During the balance of January and early February 2008, the parties negotiated over which liabilities would be satisfied with the escrowed settlement funds, and which would be the responsibilities of Cali-

fornia Sun upon the APA's execution. *See, e.g.,* E.B.App. 375, 386, 400, 431. Electric Beach agreed to "modify" the purported agreement by satisfying all unpaid rent and other obligations owed to the landlord with the settlement funds, as well as any remaining commissions owed to California Sun. Electric Beach also ultimately agreed to deduct certain minor inventory costs. E.B.App. 440–41. But, claiming that the contemplated $85,000 purchase amount was intended to encompass certain other alleged liabilities that California Sun had identified (particularly, the cost to replace the air conditioning system), it refused to agree to further deductions from the settlement funds.

Negotiations continued, but the parties ultimately never executed the APA. On February 18, 2008, Electric Beach filed a motion in the District Court to enforce the settlement agreement as set forth in the series of early January 2008 e-mails discussed above. After a two-day evidentiary hearing, the District Court granted the motion. E.B.App. 1–5. Specifically, it held that the parties had reached an enforceable settlement agreement in early January 2008, and that the various e-mails evidenced the agreement. E.B.App. 199–205. Finding implicit in the agreement a condition that the assets to be purchased come "free of all liens and encumbrances," E.B.App. 202, the District Court confirmed the deduction of back rent and other unpaid utilities, and also ordered additional sundry offsets for costs related to repairs and inventory. E.B.App. 2–5. Finally, the District Court directed Electric Beach to return certain items that had been removed from the Trolley Square Franchise,[4] and to pick up several tanning beds that it independently owned. *Id.* In all,

---

4. Relevant here, these items included a "tootsie" tanning machine, a palm tree, and 600 pairs of sunglasses. E.B.App. 3.

the District Court ordered California Sun to remit $63,983.60. to Electric Beach, and that the funds be held in escrow pending allocation upon the close of the Carters' divorce proceedings. California Sun appeals.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338, and 15 U.S.C. § 1121. Our jurisdiction arises under 28 U.S.C. § 1291. California Sun presses two jurisdictional arguments that we must address at the outset. First, it asserts that upon assuming control of the Trolley Square Franchise, a live case or controversy over which the District Court could exercise jurisdiction ceased to exist, because at that point it had obtained the only relief sought in its complaint, i.e., cessation of Electric Beach's use of its marks. Second, California Sun argues that once the District Court had deducted more than $10,000 in rent and utility payments from the $85,000 settlement funds, the amount in controversy no longer supported subject-matter jurisdiction. These claims test the boundaries of good faith.

■■■ "Mootness analysis traditionally begins with 'the requirement of Article III of the Constitution under which the exercise of judicial power depends upon the existence of a case or controversy.'" *Int'l Bhd. of Boilermakers v. Kelly*, 815 F.2d 912, 914 (3d Cir.1987) (quoting *North Carolina v. Rice*, 404 U.S. 244, 246, 92 S.Ct. 402, 30 L.Ed.2d 413 (1971)). In short, "'a case is moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome.'" *Id.* at 915 (quoting *Powell v. McCormack*, 395 U.S. 486, 496, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969)). A "live" controversy entails "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *Id.* (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241, 57 S.Ct. 461, 81 L.Ed. 617 (1937)).[5] However the legal standard is formulated, "the central question of all mootness problems is whether changes in circumstances that prevailed at the beginning of the litigation have forestalled any occasion for meaningful relief." *Jersey Cent. Power and Light Co. v. New Jersey*, 772 F.2d 35, 39 (3d Cir.1985). In this case, the answer is clearly "no."

■■■ Indulging California Sun's unsupported claim that a case becomes moot upon recovery of the relief originally sought—notwithstanding the adversary's counter-argument that such relief was pursuant to a settlement agreement—would undermine the courts' ability to enforce settlement agreements when one party refuses unilaterally to comply. "It is well settled that a federal court has the inherent power to enforce and to consider challenges to settlements entered into in cases originally filed therein." *Fox v. Consol. Rail Corp.*, 739 F.2d 929, 932 (3d Cir.1984) (quoting *Pearson v. Ecological Science Corp.*, 522 F.2d 171 (5th Cir.1975); *cf. Washington Hosp. v. White*, 889 F.2d 1294, 1298–99 (3d Cir.1989)). This maxim knows no greater force than when a putative settlement agreement is reached and partially completed during still-ongoing litigation. On appeal, it is California Sun that seeks entitlement to the settlement funds put into escrow. True, it no longer needs the equitable relief that it originally sought from the District Court. But we find it self-contradictory for California Sun to argue that there is no live dispute on the one

---

**5.** Prudential considerations of mootness do not affect our analysis here, and we do not discuss them. *See generally Kelly*, 815 F.2d at 915.

hand, yet complain that the District Court's conclusion on the merits was in error and that it should get its money back on the other. The dispute between the parties—over which each party has a manifestly cognizable interest (such as the settlement funds put into escrow while the litigation remained pending) was at all times live before the District Court, and it remains live today.

■ California Sun's amount-in-controversy argument fares no better. We need not address its dubious claim that the amount actually in controversy fell below $75,000 once the liabilities were deducted. Upon amending its complaint without referencing or adopting the original, diversity jurisdiction ceased to be a basis for jurisdiction. *See King v. Dogan*, 31 F.3d 344, 346 (5th Cir.1994) ("An amended complaint supersedes the original complaint and renders it of no legal effect unless the amended complaint specifically refers to and adopts or incorporates by reference the earlier pleading.") (citation omitted). Because federal-question and federal trademark jurisdiction—which carry no amount-in-controversy requirement, *see Mattel, Inc. v. Barbie–Club.com*, 310 F.3d 293, 298 (2d Cir.2002) (citing 15 U.S.C. § 1121(a); 28 U.S.C. §§ 1331, 1338)—properly underlay the District Court's exercise of subject-matter jurisdiction, the amount actually in controversy here is irrelevant.

### III.

California Sun separates its claims on the merits into several sub-claims, which are all part-and-parcel of its overarching argument that the District Court erred by requiring the disbursement of the escrow funds to Electric Beach. Specifically, California Sun argues that: (1) the e-mails did not constitute an enforceable agreement because the parties only intended to be bound by a completed APA; (2) the doctrines of mutual and unilateral mistake preclude enforcement of any agreement; and (3) even if the e-mails are deemed to have established an enforceable agreement in the abstract, the agreement should not be enforced here because Electric Beach's conduct constituted a material breach and was a product of unclean hands.[6]

■ It is by now axiomatic under Pennsylvania law that "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298–99 (3d Cir. 1986) (citing *Lombardo v. Gasparini Excavating Co.*, 385 Pa. 388, 123 A.2d 663, 666 (1956); *Linnet v. Hitchcock*, 324 Pa.Super. 209, 471 A.2d 537, 540 (1984)). "In ascertaining the intent of the parties to a contract, it is their outward and objective manifestations of assent, as opposed to their undisclosed and subjective intentions, that matter." *Espenshade v. Espenshade*,

---

**6.** Settlement agreements are nothing more than contracts, and therefore basic contracts principles apply. This Court's review of the existence and legal consequences of a settlement agreement is plenary. *See Flemming v. Air Sunshine, Inc.*, 311 F.3d 282, 289 (3d Cir.2002). Where, as here, there has been an evidentiary hearing and explicit findings of fact have been made—including a finding that the parties agreed to certain settlement terms and intended to be bound thereby—we review those findings for clear error. *See In re Cen-*

*dant Corp.Prides Litig.*, 233 F.3d 188, 193 (3d Cir.2000); *Tiernan v. Devoe*, 923 F.2d 1024, 1031 n. 5 (3d Cir.1991). Although the underlying case concerned only federal claims, we see no good reason why state law should not apply in these circumstances. *See Edwards v. Born, Inc.*, 792 F.2d 387, 389 (3d Cir.1986); *Tiernan*, 923 F.2d at 1032–33 & n. 6. We accordingly apply Pennsylvania contract law, as the parties' franchise agreement stipulated that the Commonwealth's law would govern their relationship.

729 A.2d 1239, 1243 (Pa.Super.Ct.1999). Additionally, "[w]here the parties have agreed on the essential terms of a contract, the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement." *Mazzella v. Koken*, 559 Pa. 216, 739 A.2d 531, 536 (1999) (citations omitted). "If all of the material terms of a bargain are agreed upon, the settlement agreement will be enforced. If, however, there exist ambiguities and undetermined matters which render a settlement agreement impossible to understand and enforce, such an agreement must be set aside." *Id.* (internal citation omitted).

■ We find no error—clear or otherwise—in the District Court's conclusion that the early January e-mails evidenced the parties' mutual assent and intention to be bound by the material terms of the contemplated agreement. Counsel for each party stated explicitly via e-mail that they stipulated to the essential terms of the agreement, including a release of claims by all parties, and $85,000 in exchange for unencumbered ownership of the Trolley Square Franchise. E.B.App. 200–02, 331–37. As the District Court noted, California Sun's attorney also subsequently transmitted confirmatory e-mails during late January and early February corroborating the existence of an agreement. E.B.App. 202–03, 426, 510; 515. Retiring any lingering doubt on the issue is California Sun's January 8, 2008 letter to the District Court advising that an agreement-in-principle had been reached, and that the "parties anticipate[d] that they w[ould] be able to reduce their agreement to writing and consummate all aspects of that agreement...." E.B.App. 338. We find the material terms of the agreement pellucidly clear, and the parties' intent to be bound thereby equally evident from the record. We also find lacking any evidence that the parties believed that the enforceability of any agreement would be contingent on the execution of a writing memorializing its terms. *Cf. Essner v. Shoemaker*, 393 Pa. 422, 143 A.2d 364, 366 (1958). Accordingly, we agree with the District Court's conclusion that the parties entered into an enforceable settlement agreement.

■ We reject the remaining arguments. California Sun claims that because it "mistakenly" believed that Electric Beach had agreed to transfer all assets of the franchise free of encumbrances, but did not so agree in fact, it is not duty-bound to perform its own end of the bargain. We disagree. Given the District Court's apt interpretation of the settlement agreement—that an implicit provision required the transfer of unencumbered assets, E.B.App. 202—the doctrines of unilateral and mutual mistake are inapposite here. The doctrine of mutual mistake—a defense to contract formation—"serves as a defense to the formation of a contract and occurs when the parties to the contract have an erroneous belief as to a basic assumption of the contract at the time of formation which will have a material effect on the agreed exchange as to either party." *Hart v. Arnold*, 884 A.2d 316, 333–34 (Pa.Super.Ct.2005) (internal citations and quotations omitted); *see also* Restatement (Second) of Contracts, § 152 (1981). The doctrine of unilateral mistake permits a mistaken party to void a contract if the effect of the mistake would render enforcement unconscionable, or if the non-mistaken party had reason to know of or caused the mistake. *See Lanci v. Metro. Ins. Co.*, 388 Pa.Super. 1, 564 A.2d 972, 974–75 (1989) (quoting Restatement (Second) of Contracts, § 153). California Sun's current protestations notwithstanding, the District Court found that the settlement agreement implicitly contemplated that California Sun was to receive

348

the franchise assets free and clear of all encumbrances, and it deducted the corresponding amounts accordingly. As such, there is no mistake—mutual or unilateral—of which to complain; to the contrary, California Sun received everything for which it bargained.[7]

■ For similar reasons, we reject California Sun's claim that Electric Beach is not entitled to specific performance because it: (1) materially breached the settlement agreement; and (2) seeks equity with unclean hands. It is California Sun that seeks to retain the benefit of its bargain with Electric Beach (ownership of the Trolley Square Franchise) without satisfying its corresponding obligation (paying $85,000 minus court-ordered offsets). This it may not do:

> Under basic contract principles, when one party to a contract feels that the other contracting party has breached its agreement, the non-breaching party may either stop performance and assume the contract is avoided, or continue its performance and sue for damages. Under no circumstances may the non-breaching party stop performance and continue to take advantage of the contract's benefits.

*Pappan Enters. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir.1998) (citation omitted). We conclude that Electric

7. We note that California Sun does not challenge the correctness of the itemized offsets for back rent, utilities, repairs, and inventory, or the District Court's refusal to grant specific deductions. *See generally* E.B.App. 2–4. In any event, having reviewed the record, we find the District Court's allocation of funds amply supported by the record. Finally, we reject California Sun's claim that rescission or avoidance of the agreement is appropriate based on Lee Carter's removal of certain items from the salon (e.g., the "tootsie" tanning machine, palm tree, and 600 pairs of sunglasses). The District Court specifically found that the agreement called for the return

Beach has not breached the agreement, and that equity tilts in its favor.[8]

## IV.

The District Court's factual findings are manifestly supported by the record, and its legal analyses sound. For the foregoing reasons, we will affirm.

of these items, and included this term in its order. E.B.App. 3. California Sun therefore received the benefit of its bargain.

8. Whether there was factual or legal merit to California Sun's underlying claims is not before us; at issue here is the settlement agreement. Having steadfastly maintained its position that it may retain full title to the Trolley Square Franchise but is not obligated to dispense *any* of the settlement funds in return, California Sun's appeal to equity is sorely misplaced.