# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong Township           :
                                  :
                                  :
        v.                  :   No. 140 C.D. 2022
                                  :   Submitted: April 21, 2023
                                  :
Lycoming County Board of     :
Assessment Appeals and       :
Choice FuelCorp, Inc.           :
                                  :
Appeal of:  Choice FuelCorp, Inc.  :


BEFORE:   HONORABLE RENÉE COHN JUBELIRER, President Judge
                 HONORABLE CHRISTINE FIZZANO CANNON, Judge
                 HONORABLE LORI A. DUMAS, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION
BY JUDGE DUMAS                            FILED:  April 5, 2024

Choice FuelCorp, Inc. (Choice) appeals from the order of the Court of Common Pleas of Lycoming County (trial court), dated January 25, 2022, granting the motion to enforce a settlement agreement filed by Armstrong Township (Township).  After careful review, we reverse the trial court's order.

## I. BACKGROUND[1]

In 2006, Choice purchased the property at issue, located in Lycoming County (Property).  The Property has a preexisting, non-conforming use as a fuel tank storage farm.  In July 2016, Choice entered into a consent order and agreement in order to undertake improvements to the Property and bring the tanks back to operational status.  To obtain the required permits and approvals for the endeavor, Choice was required to submit a market value report to the Township.  Choice

---

[1] Unless otherwise stated, we base the statement of facts on the opinion of the trial court. *See* Trial Ct. Op., 1/25/22, at 1-5 (unpaginated).

complied with this requirement and submitted a report concluding that the Property's market value was $3,700,000.00. At the time, the Township's assessed value of the Property was $237,180.00. Because of the large discrepancy between the Township's assessed value and Choice's reported market value, the Township requested that the Lycoming County Board of Assessment Appeals (Board) reassess the Property for the purposes of a 2020 real estate tax assessment.

In October 2019, the Board held a hearing regarding the Township's request. At the hearing, the Township argued that because the assessed value of the Property was significantly less than Choice's own market value, the Property should be reassessed at a higher value. *See*, *e.g.*, Pet. for Appeal, 11/13/19, ¶¶ 1-23. Following the hearing, the Board mailed an order denying the Township's request and finding no change in the assessed value of the Property. *See* Decision Order, 10/15/19. The order stated that both the old and new assessed value of the Property was $237,180.00. *See id.*[2]

The Township appealed to the trial court.[3] Following several continuances, the trial court held a *de novo* hearing on February 26, 2021. The parties disputed the value of the Property, the highest and best use of the Property, and whether the Property's use as a biochemical fuel storage facility was legally

---

[2] The Township asserted that the Lycoming County Assessment Office records reflected that the land was assessed at $73,050.00, and the buildings were assessed at $164,130.00. *See* Pet. for Appeal, 11/13/19. The Board's decision order states only that the assessed value was $237,180.00 and does not provide any reasoning for this decision; the basis for the Township's determination is unclear from the record as provided.

[3] Choice filed preliminary objections, arguing that the Township's appeal failed to identify an alleged market value as of the date the appeal was filed. *See* Prelim. Objs., 1/15/20, ¶¶ 1-5. From the docket and original record, it does not appear that the trial court ever issued an order resolving the objections.

permissible. *See* Trial Ct. Op., 3/12/21, at 3.[4] Ultimately, the trial court concluded that the use as a tank farm was legally permissible, that use as a tank farm was the highest and best use of the Property, and that the "fair market value" of the Property was $774,177.00.[5] *See* Trial Ct. Op., 3/12/21, at 11. The trial court entered an order vacating the Board's decision. *See id.*

Choice and the Township filed motions for post-trial relief, challenging the trial court's determination of fair market value. The Township argued that the trial court erred by disregarding its expert's conclusion regarding storage tank capacity, which lowered the market value of the Property. *See* Twp. Mot., 3/22/21, at 1-8 (unpaginated). According to the Township, the Property's fair market value should have been set at $1,900,000.00. *See id.*

Choice, on the other hand, contended that the trial court had erred in its calculation of the Property's value[6] and exceeded its authority as the finder of fact by rendering an "opinion" of the value that was not supported by the record. *See*

---

[4] Both Choice's and the Township's experts explained during their testimony that in order to determine the market value of a property, the highest and best use analysis must be considered. *See* Trial Ct. Op., 3/12/21, at 3.

[5] Although the appeal was from the Board's decision regarding the Property's assessed value, the trial court's order did not address the Property's assessed value, nor did it identify the common level ratio (CLR) to be applied to the Property's fair market value. *See* Trial Ct. Op., 3/12/21, at 3; *see also* Decision Order, 10/15/19. Section 102 of The General County Assessment Law defines the CLR as "the ratio of assessed value to current market value used generally in the county as last determined by the State Tax Equalization Board pursuant to the act of June 27, 1947 (P.L. 1046, No. 447), referred to as the State Tax Equalization Board Law." Act of May 22, 1933, P.L. 853, *as amended*, 72 P.S. § 5020-102. In appeals from assessments, the trial court should make the determination of the market value as of the date such appeal was filed, and the common level ratio applicable in the original appeal. *See* Section 518.2 of the General County Assessment Law, added by the Act of December 13, 1982, P.L. 1160, 72 P.S. § 5020-518.2.

[6] Choice's motion for post-trial relief does not make clear whether "value" referred to assessed or fair market value, nor did it identify a specific number it considered appropriate. *See* Choice Mot. for Post-Trial Relief, 3/30/21, ¶¶ 1-3. Rather, Choice took issue with the trial court's findings of fact regarding value per square foot of the buildings located on the Property and the value and cost of new tanks installed on the Property. *See id.*

Choice Mot. for Post-Trial Relief, 3/30/21, ¶¶ 1-3. Additionally, Choice contended that the trial court had erred by failing to credit and apply the common level ratio at issue in the original appeal to the Board as required by 53 Pa.C.S. § 8854(a)(2)-(3). *See id.*

The trial court heard argument on the motions. However, before the trial court could dispose of either motion, the parties informed the trial court that they were engaged in settlement negotiations for tax years 2020 and 2021. Those negotiations culminated in May 2021, with an email exchange between counsel for the parties and Jason Weisz, Choice's owner.[7] However, an apparent agreement quickly ended when Weisz informed his counsel that he would not agree to the terms proposed.

After negotiations broke down, the Township filed a motion to enforce the settlement agreement. The Township argued that Choice had tendered an offer of settlement that was accepted by the Township and that there was no legally valid reason to nullify the agreement.[8] *See* Twp. Mot. to Enforce Settlement, 5/28/21. Choice responded that the parties had not reached an enforceable settlement agreement. *See* Choice Resp. to Mot. to Enforce Settlement Agreement, 6/16/21.

Following an evidentiary hearing and oral argument, the trial court granted the Township's motion. Thus, the trial court determined that Choice had agreed to a 2020 assessed value of $544,246.43, and a 2021 assessed value of $1,000,000.00. Choice timely appealed to this Court.

---

[7] Attorney Michael Wiley (Wiley) represented the Township; Attorney Scott Williams (Williams or Choice's counsel) represented Choice and Jason Weisz (collectively, Choice). *See* Twp. Mot. to Enforce Settlement, 5/28/21, at Exs. A & B.

[8] Specifically, according to the Township, Choice had agreed to a 2020 fair market value of $774,177.00, with an assessed value of $544,246.43, and a 2021 fair market value of $1,538,461.54, with an assessed value of $1,000,000.00. *See id.* For those years, the CLR would be .703 and .650, respectively. *See id.*

4

## II. ISSUES[9]

Choice claims that a settlement agreement cannot be made when conditions to acceptance of a proposal are not satisfied before the proposal is withdrawn. *See* Choice's Br. at 4. Additionally, Choice asserts that its counsel did not have express authority to settle the case with the terms of the settlement agreement. *See id.*

## III. DISCUSSION[10]

### A. Settlement Agreements

A settlement agreement is "a contract binding the parties[.]" *Roe v. Pa. Game Comm'n*, 147 A.3d 1244, 1250 (Pa. Cmwlth. 2016). Accordingly, courts construe settlement agreements according to "traditional principles of contract construction." *DeLuca v. Mountaintop Area Joint Sanitary Auth.*, 234 A.3d 886,

---

[9] We have reordered and combined Choice's issues for ease of analysis. Choice identifies an additional issue and contends that it should not be bound by counsel's mistaken representation of Choice's position, because an attorney cannot bind his client to a settlement agreement that was not expressly authorized. *See* Choice's Br. at 4. Based upon our disposition of the matter, we need not address this issue.

Additionally, we note that, pursuant to Pa.R.A.P. 2119(a), the argument section of a brief "shall be divided into as many parts as there are questions to be argued; and shall have at the head of each part—in distinctive type or in type distinctively displayed—the particular point treated therein, followed by such discussion and citation of authorities as are deemed pertinent." Choice's statement of questions involved lists three separate issues, but the argument section conflates two of those issues and fails to adequately develop either. "An issue that is not addressed or developed in the argument section of a brief may be waived." *Dobson Park Mgmt., LLC v. Prop. Mgmt., Inc.*, 203 A.3d 1134, 1139 (Pa. Cmwlth. 2019). Nevertheless, because we may discern the arguments Choice attempts to preserve, we decline to find waiver in this instance.

[10] When reviewing a trial court's decision to enforce a settlement agreement, our scope of review is plenary as to questions of law, and we are "free to draw our own inferences and reach our own conclusions from the facts as found by the court." *Hydrojet Servs., Inc. v. Reading Area Water Auth.*, 220 A.3d 1199, 1204 n.4 (Pa. Cmwlth. 2019) (citation omitted). The findings of fact must be supported by substantial evidence. *See id.* We view the evidence in the light most favorable to the prevailing party and will "only overturn the trial court's decision when the factual findings of the court are against the weight of the evidence or its legal conclusions are erroneous." *Id.*

898 (Pa. Cmwlth. 2020) (citation omitted). A settlement agreement must contain all elements of a valid contract: an offer, acceptance, and consideration. *See id.* The enforceability of the agreement requires that "the minds of the parties should meet upon all the terms, as well as the subject [] matter, of the [agreement]." *Id.* (citation omitted); *see also Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999); *E. Penn Twp. v. Swartz*, 304 A.3d 116, 127 (Pa. Cmwlth. 2023). Courts are permitted to enforce the terms of agreements even if the terms are not yet formalized in writing, but they must contain all essential terms for a valid contract as well as a meeting of the minds. *See Swartz*, 304 A.3d at 127. A party wishing to invalidate a contract must "show fraud or mutual mistake by clear, precise and convincing evidence." *Baribault v. Zoning Hr'g Bd. of Haverford Twp.*, 236 A.3d 112, 118 (Pa. Cmwlth. 2020).

While settlement agreements are highly favored, an attorney must have express authority to bind a client to a settlement agreement. *Reutzel v. Douglas*, 870 A.2d 787, 789-90 (Pa. 2005); *see also Rockey v. Big Spring Sch. Dist.*, 699 A.2d 1331, 1334 (Pa. Cmwlth. 1997). This is because "parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly." *Reutzel*, 870 A.2d at 789-90. Express authority can only exist "where the principal specifically grants the agent the authority to perform a certain task on the principal's behalf." *Id.* (quoting RESTATEMENT (SECOND) OF AGENCY § 7 cmt. c (Am. Law Inst. 1958)).

"There is a presumption that a settlement entered into by an attorney has been authorized by the client, although rebuttal of the presumption will render the purported settlement ineffective." *Rockey*, 699 A.2d at 1134. This Court has observed that there are situations where "an attorney, by mistake or otherwise, will misrepresent a client's position." *Id.* Such a situation may "easily be determined

6

and addressed by a fact-finding exercise, once the client has come forward to deny the attorney's representations." *Id.*

Where a client repudiates his or her counsel's authority in a timely manner after settlement, courts will not find express authority. *See Yarnall v. Yorkshire Worsted Mills*, 87 A.2d 192, 193 (Pa. 1952). Conversely, "[a] client ratifies his attorney's act if he does not repudiate it promptly upon receiving knowledge that the attorney has exceeded his authority." *Id.*

### B. No Settlement Agreement Was Reached

### 1. The arguments of the parties

Although its argument is somewhat difficult to parse, Choice asserts that emails may be admitted into evidence as circumstantial evidence of the terms of an oral contract. *See* Choice's Br. at 13. According to Choice, an email message may contain a contract, or may refer to a contract. *See id.* However, a reference to a written contract "does not necessarily render it part of the contract" but instead is "evidence related to" a contract. *See id.* Choice goes on to assert that "the email exchange was not the agreement, but evidence of an agreement which had to be executed by the parties" and which was never executed prior to Weisz's repudiation of the terms of the contract. *See id.* at 13-14. Although inartfully stated, we may discern from this statement the following argument: Choice asserts that the parties had not reached a settlement but, rather, were engaged in ongoing negotiations regarding the settlement.

Additionally, Choice asserts that even if there was some factual basis for finding an agreement, its counsel lacked express authority from Weisz to enter a settlement with an assessed value of $1,000,000.00. *See* Choice's Br. at 13. Rather, according to Choice, Weisz gave express authority to settle at a fair market value of $774,177.00 for 2020, and a fair market value of $1,000,000.00 for 2021 going

7

forward. *See id.* Choice contends that Weisz's swift denial of a settlement with an assessed value of $1,000,000.00 is proof that the proffered term lacked authorization. *See id.* Further, Choice asserts that Weisz's understanding of the original authorization was reasonable, justified, and uncontroverted. *See id.* Essentially, we view this argument as Choice's assertion that it promptly repudiated any express authority of its counsel.

The Township responds that Choice's position represents a "fundamental misunderstanding of the law governing settlement agreements." *See* Twp.'s Br. at 18. According to the Township, under Choice's position, there would never be an enforceable settlement agreement until the ink is dry. *See id.* The Township asserts that a court "must enforce a settlement agreement where it contains all of the necessary elements of a valid contract, *e.g.*, an offer, an acceptance, and consideration, even if the terms have not yet been formalized in writing." *See id.* at 18-19. According to the Township, the material terms of the settlement were documented by electronic mail and the settlement documents were already drafted; everything was "done" except for signatures on the documents. *See id.* at 19. Therefore, the Township asserts that an enforceable settlement agreement had been reached. *See id.*

The Township further asserts the well-settled presumption that a settlement entered into by an attorney has been authorized by that attorney's client. Twp.'s Br. at 15-16. According to the Township, based on the evidence introduced at the hearing, counsel for Choice had express authority to settle the case. *See id.*

### 2. Discussion

In *Swartz*, a township filed a complaint against property owners due to their failure to cure violations of the township's zoning ordinance. *Swartz*, 304 A.3d at 118. Following a bench trial in which judgment was entered in the township's

8

favor, the township filed a petition to hold the owners in civil contempt of the judgment, and the owners filed a motion to enforce an alleged settlement agreement between them and the township. *See id.* at 118-120. The trial court denied the owners' motion. *See id.*

This Court examined in detail emails between the township and property owners, noting that the record showed that the parties had agreed upon certain terms, which included a monetary amount to resolve the judgment, instructions for permits, and the mutual expectation that the parties would execute an agreement in writing. *See id.* at 130. However, the emails *also* indicated that the parties had never expressly agreed, in their negotiations, to the relationship between the violations and trial court's verdict upon them, and the potential settlement. *See id.* at 130-34. This Court also noted that further exchanges suggested that essential terms were still at issue even though draft agreements for settlements had been exchanged. *See id.* Accordingly, there was no meeting of the minds, and no settlement agreement. *See id.*

In the instant case, the Township's counsel sent a proposed settlement agreement to Choice, which set forth values for market value, the common level ratio, and assessed value. *See* Twp. Mot. to Enforce Settlement, Exs. A & B. On May 14, 2021, Williams rejected an assessment change in 2020, but indicated that Choice would agree to "an assessment of $1,050,000 beginning in 2021." *See* Twp. Mot. to Enforce Settlement, Ex. B. Wiley rejected that proposal and responded that he was authorized to provide a letter confirming that the Township would not seek to separately enforce a consent order that Choice had entered into with the Pennsylvania Department of Environmental Protection. *See id.* Further, he was authorized to agree to execution of the settlement agreement as previously circulated May 10, 2021. *See id.*

9

On May 17, 2021, at 1:36 p.m., Williams emailed Weisz, "If you would propose what the judge ordered of $700k + or – for 2020 and then the $1M for 2021 going forward, M. Wiley will recommend it to the Township." *See* Choice Resp. to Mot. to Enforce Settlement Agreement, 6/16/21, at Ex. A. At 1:38 p.m., Weisz responded, "Done." *See id.*

At 2:10 p.m., Williams emailed Wiley to inform him that Weisz had authorized him to propose that, if he would change the stipulation to recognize the trial court's "[fair market value] finding of $774,188 and assessed value of $544,246.43 in 2020," as well as the other letters and certifications outlined in the prior email, Weisz would agree. *See* Twp. Mot. to Enforce Settlement, at Ex. B. Williams stated that he would copy Weisz on the email to prevent any misunderstandings. *See id.*

At 3:45 p.m., Wiley responded that he had discussed the terms with the Township and had authority to accept the proposal "as previously provided and circulated as revised by your client's proposal for [a fair market value of $774,177.00 and assessed value of $544,246.43 for the 2020] tax year." *Id.* Notably, however, Wiley also requested that Williams "please confirm in writing that we have a settlement . . . ." *Id.*

At 3:57 p.m., Williams forwarded the written document to Weisz and asked, "How does this look?" *Id.*; *see* Notes of Testimony (N.T.), at 14. However, Weisz responded "immediately" and said that he did not agree to those terms. N.T. at 14.

Then, at 4:29 p.m.—two hours and 51 minutes after Weisz's initial response and a little over two hours after Williams conveyed this tentative

agreement—Williams sent Wiley an additional email stating, "We have no deal." Twp. Mot. to Enforce Settlement, at Ex. B.[11]

At the hearing on the motion to enforce the settlement, Choice's counsel[12] testified that he understood that "$1M for 2021 going forward" meant the assessed value, not the fair market value. N.T. at 8-14. He also suggested that there was no misunderstanding between himself and the Township's counsel but nonetheless believed there was not a meeting of the minds between the Township and Choice. N.T. at 12-14. However, he also clearly stated that, after viewing the written agreement, Weisz had immediately responded that he would not agree to the terms. *See id.* at 14. Choice's owner Weisz, on the other hand, testified that he assumed that he and counsel were discussing the terms of the fair market value. N.T. at 22-26, 35. According to Weisz, he never authorized counsel to offer a $1,000,000.00 assessed value to the Township. N.T. at 27-28. Weisz reiterated that he "immediately" saw it was something he "did not agree to." *See id.* at 29.

The trial court acknowledged these factual details but came to a different legal conclusion. *See* Trial Ct. Op. at 24. The trial court noted that it was unable to find case law directly on point with the factual circumstances but opined that it must determine whether a contract was formed, whether Williams had express authority to settle the matter, and whether a mutual mistake or fraud had occurred such that an otherwise enforceable contract was rendered ineffective. *See id.* at 23-24. The trial court concluded that Williams had express authority to settle the matter based on the fact that he had been conducting negotiations on Choice's behalf and because Weisz had stated "done" when presented with the final terms. *See id.* at 24-25. The trial court opined that, although there was a miscommunication between

---

[11] Williams also suggested that he was embarrassed by the lack of agreement. *See id.*

[12] At the time of the hearing, Williams still represented Choice. However, he also testified as a fact witness.

11

Williams and Weisz, it was no fault of the Township or Wiley that this miscommunication occurred. *See id.* at 25. The trial court stated that it could find no authority providing that a miscommunication between an attorney and his client invalidates an otherwise valid settlement agreement or rescinds otherwise express authority previously given to the attorney.[13] *See id.* at 25-26.

The Township's and the trial court's analysis misses the salient point: there was no meeting of the minds. Although the Township had drafted a written settlement agreement, Wiley's email, stating, "please confirm in writing that we have a settlement agreement" constitutes an admission by the Township that there was *not* a meeting of the minds at that point. *See* Twp. Mot. to Enforce Settlement, at Ex. B. Rather, the parties were still engaged in negotiations regarding the terms, as further evidenced by Weisz's immediate denial of the settlement document and terms, as well as his testimony that he "immediately" saw that the terms were something he "did not agree to." *See* N.T. at 27-29. The emails exchanged between the parties clearly indicate that there was no meeting of the minds as to "all the

---

[13] Agreeing with the trial court, the Township cites in support *Mastrioni-Mucker v. Allstate Insurance Company*, 976 A.2d 510 (Pa. Super. 2009) and *Reed v. Pittsburgh Board of Public Education*, 862 A.2d 131 (Pa. Cmwlth. 2004). *See Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018) (while Superior Court decisions are not binding on this Court, they offer persuasive precedent where they address analogous issues). However, neither case is persuasive.

In *Mastrioni-Mucker*, a settlement agreement reached just before jury deliberations was held to be valid and binding, despite the absence of a written release, because the parties had agreed upon the essential terms and intended them to be binding. *See Mastrioni-Mucker*, 976 A.2d at 518. In the instant case, however, the parties had *not* agreed upon the essential terms, and there was no meeting of the minds.

*Reed* is even less relevant a citation. In *Reed*, a litigant claimed that the City of Pittsburgh's School District's failure to hire her as a teacher breached her contract with the defendants. *See Reed*, 862 A.2d at 132. Reed argued that an eligibility list, which the school district was required to keep and which listed her in the top 10% of eligible applicants, constituted a contract. *See id.* at 133. This Court concluded that no contract existed between Reed and the defendants, because the defendants had not made an offer: rather, the eligibility list was an invitation to apply. *See id.*

12

terms" of the agreement and, accordingly, no enforceable agreement. *See Mazzella*, 739 A.2d at 536; *Swartz*, 304 A.3d at 133-34; *cf. Mastrioni-Mucker*, 976 A.2d at 518.

Further, even if there was some factual basis to find an agreement had been reached—such as the email from Weisz to Williams stating "done"—it is clear that Weisz promptly repudiated any authority on Williams' part to complete the settlement. As noted, *supra*, where a client promptly repudiates his counsel's authority, courts will not find express authority to settle. *Yarnall*, 87 A.2d at 193.

In *Yarnall*, the Pennsylvania Supreme Court concluded that the client had known the terms of a stipulation shortly after it was signed by his attorney and approved by a judge. *See Yarnall*, 87 A.2d at 193. Moreover, the client had accepted proceeds of the settlement. *See id.* He did not file a formal objection until eight months later, and even then, the client did not claim that his attorney lacked authority. It was another ten months before the client repudiated the stipulation. *See id.* Upon these facts, the Court determined that this was not a prompt repudiation. *See id.*; *see also Piluso v. Cohen*, 764 A.2d 549, 550-51 (Pa. Super. 2000) (client ratified attorney's settlement actions by failing to promptly repudiate the actions where she waited until after the verdict was returned against the non-settling defendant to voice disapproval).

Here, Choice disputed its counsel's authorization to enter into a settlement based upon Weisz's prompt repudiation of the terms.[14] Accordingly, in

---

[14] Although Choice does not specifically use the phrase repudiation, it argues that "Weisz came forward to deny a settlement with an [assessed value] of $1M for 2021 going forward within minutes of that term being forwarded to him by email." *See* Choice's Br. at 13. This argument is sufficiently close to the terminology of prompt repudiation to preserve the issue.

the instant matter, there was a prompt repudiation of any express authority[15] by counsel to enter into a settlement agreement, no more than three hours after the email. *Cf. Yarnall*, 87 A.2d at 193; *Piluso*, 764 A.2d at 550-51.

Accordingly, we conclude that the trial court erred and abused its discretion in concluding that the parties had reached a valid and enforceable settlement agreement. *See Mazzella*, 739 A.2d at 536; *Swartz*, 304 A.3d at 133-34. Nor did the record establish Williams' express authority to settle the matter, where Choice promptly repudiated the settlement and provided testimony of that repudiation at an evidentiary hearing. *See Reutzel*, 870 A.2d at 789-90; *Rockey*, 699 A.2d at 1134. Accordingly, the trial erred in concluding that Williams had express authority to settle the matter on behalf of Weisz. *Hydrojet Services, Inc.*, 220 A.3d at 1204 n.4.

## IV. CONCLUSION

For the foregoing reasons, we reverse the trial court's order of January 25, 2022, finding that Williams had express authority to enter into the contract, and that a valid contract had been entered into by the parties, and granting the Township's motion to enforce settlement agreement.

LORI A. DUMAS, Judge

---

[15] We note further that the email Williams sent to Weisz is ambiguously worded and, at the evidentiary hearing, Weisz rebutted the presumption of authorization by testifying that his attorney, by mistake, had misrepresented his position. *See Rockey*, 699 A.2d at 1134.

14

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Armstrong Township              :
                                       :
          v.                   :    No. 140 C.D. 2022
                                         :
Lycoming County Board of       :
Assessment Appeals and         :
Choice FuelCorp, Inc.              :
                                         :
Appeal of: Choice FuelCorp, Inc.    :

## **O R D E R**

AND NOW, this 5th day of April, 2024, the order of the Court of Common Pleas of Lycoming County, entered January 25, 2022, granting the motion to enforce settlement agreement filed by Armstrong Township, is REVERSED.

<br>

                                       _____
                                       LORI A. DUMAS, Judge