J-A11033-23

## 2023 PA Super 95

| | | |
|---|---|---|
| JOHN G. KING | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CHRISTOPHER P. DRISCOLL | : | |
| | : | |
| Appellant | : | No. 1291 WDA 2022 |

Appeal from the Order Entered October 14, 2022
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): No,. GD 21-004533

BEFORE: BENDER, P.J.E., STABILE, J., and PELLEGRINI, J.*

OPINION BY PELLEGRINI, J.:                                    **FILED: JUNE 5, 2023**

Christopher P. Driscoll (Driscoll) appeals from the order entered in the Court of Common Pleas of Allegheny County (trial court) granting the petition to enforce settlement filed by John G. King (King). The trial court determined that the parties reached an enforceable agreement for Driscoll to sell King his shares in the restaurant that they co-own because King's attorney accepted a "redlined" version of the agreement sent by Driscoll's attorney. On appeal, Driscoll argues that the trial court erred because both he and his attorney testified at the evidentiary hearing that Driscoll never gave his attorney express authority to settle the case without first obtaining the restaurant's application to receive funds under the Restaurant Revitalization Fund (RRF). Because the trial court made no findings concerning whether Driscoll's

_____

* Retired Senior Judge assigned to the Superior Court.

attorney had express authority to enter into the agreement without his final approval, we remand with instructions.

## I.

Driscoll and King are each 50% owners of two LLCs that operate a restaurant and its building in Bellevue near Pittsburgh. When their business relationship soured, Driscoll wanted out of the business and asked King if he would be willing to buy Driscoll's membership shares. As a result, both parties obtained counsel to negotiate the buy-out of Driscoll's shares in March 2021. King hired Attorney David Fuchs and Driscoll hired Attorney Daniel Conlon. The two attorneys began negotiations in March 2021 but were unable to reach an agreement. The negotiations resumed several weeks later in May 2021.[1] During this round of negotiations, Attorney Conlon emailed Attorney Fuchs a term sheet summarizing their negotiations and asked, "if we are in agreement on all terms." Attorney Fuchs responded by adding handwritten notes to the term sheet, and Attorney Conlon incorporated those notes into another draft that he sent to Attorney Fuchs a few days later. Attorney Fuchs emailed him back with a "redlined"[2] copy of the agreement "with mostly clarifications and

---

[1] In the interim, on April 28, 2021, King filed a four-count complaint against Driscoll seeking monetary damages for breach of contract and fiduciary duties, as well as declaratory relief that Driscoll have no interest in the LLCs or, in the alternative, dissolution.

[2] "Redlining" is defined in part as "[t]he process, usu[ally] automated, of creating, for an existing document, an interim version that shows, through
*(Footnote Continued Next Page)*

a few details." The next day, which was May 20, 2021, Attorney Conlon replied that he accepted most of the changes and had "sent the agreement to Driscoll for his review," while also highlighting those changes in the draft that he did not accept. Attorney Fuchs responded that same day: "Client has approved your redline. Please get your client's signature and send me a clean copy for my client to sign."

Attorney Fuchs believed that they had an agreement but when Attorney Conlon did not send him back a clean copy for King to sign, Attorney Fuchs followed up with another email asking him to send a "clean version so we can get this done." Again, however, there was no response. Finally, when Attorney Fuchs tried again a few weeks later, Attorney Conlon emailed him a letter in which he asserted that "the parties have neither negotiated nor reached a settlement agreement." Attorney Conlon emphasized that he never represented that they had reached a settlement agreement, noting that in his last email, he wrote that he was sending the agreement to Driscoll for his review. Attorney Conlon also claimed that during a May 21st phone call, he told Attorney Fuchs that Driscoll needed a copy of the restaurant's RRF application before he would sign off on the agreement.

---

strike-outs and other typographical features, all deletions and insertions made in the most recent revision." *Redlining*, Black's Law Dictionary (8th ed. 2004).

On June 16, 2021, King filed a petition to enforce settlement alleging that the parties, through their attorneys, had reached an agreement on all material terms despite never signing the agreement. Because Driscoll disputed that an agreement was reached, the trial court held an evidentiary hearing.[3] At the hearing, Attorney Conlon testified that he negotiated the agreement on behalf of Driscoll but never had his express authority to agree to the terms of the agreement without Driscoll's final approval. Attorney Conlon also claimed throughout his testimony that Driscoll would not sign a final agreement unless he first obtained the restaurant's RRF application. Driscoll reiterated the same as he continually claimed throughout his testimony that Attorney Conlon could not finalize the agreement unless he obtained the RRF application that King submitted on the restaurant's behalf to the Small Business Administration.

Disputing that the RRF application was ever an integral part of the negotiations, King emphasized that neither the term sheet nor the draft agreements contained any mention about the application being an essential term of the agreement. On top of that, King called an accountant as a witness to show that the funds received from the SBA—$370,000—had to be used for

---

[3] *See Brannam v. Reedy*, 906 A.2d 635, 639 (Pa. Cmwlth. 2006) ("[T]he existence of a settlement agreement requires an evidentiary hearing whenever one party disputes the existence of an agreement or its binding effect.").

operating expenses and could not be used to pay Driscoll. Consequently, King characterized Driscoll's claim concerning the RRF application as a misleading, after-the-fact excuse for getting the agreement that he and Driscoll reached through their attorneys' extensive negotiations and exchange of term sheets and draft agreements.

On July 21, 2022, the trial court granted King's petition to enforce settlement. In its two-page memorandum explaining its reasoning, the trial court did not address whether Attorney Conlon had Driscoll's express authority to finalize the agreement without first obtaining the RRF application. Rather, the trial court concluded that, even though the agreement was never signed, "[t]he accepted redline version in conjunction with the term sheet establish[ed] the essential terms of the parties' agreement." Trial Court Opinion, 7/21/22, at unpaginated 2.

Following the trial court's decision, Driscoll timely moved for post-trial relief under Pa.R.Civ.P. 227.1. King responded by reasserting his arguments at trial but did not otherwise contend that Driscoll's filing was improper. After the motion was denied, Driscoll filed this appeal.

**II.**

Before addressing the merits of Driscoll's claims, we address whether we have jurisdiction over this appeal. After Driscoll filed his notice of appeal, King moved to quash this appeal as untimely because Driscoll filed a motion for post-trial relief rather than a notice of appeal after the trial court granted

the petition to enforce settlement. Citing a note to Pa.R.Civ.P. 227.1(c)(2), King observes that "[a] motion for post-trial relief may not be filed to matters governed exclusively by the rules of petition practice." Asserting that his petition fell under this rule, King points to this Court's discussion in **Bennett v. Juzelenos**, 791 A.2d 403 (Pa. Super. 2002), as directly on point:

> Our Supreme Court held in **Coco Brothers, Inc. v. Board of Public Education of the School District of Pittsburgh**, 608 A.2d 1035 (1992), that post-trial motions were not required, or even permissible, from a trial court's order disposing of a petition to enforce a judgment. The Supreme Court held that the proceedings to enforce a judgment were clearly within the type of procedures described in the Note to Rule 227.1(c)(2). Similarly, we held in **Kramer v. Schaeffer**, 751 A.2d 241 (Pa. Super. 2000), that no post-trial motions were required from a trial court's decision on a motion to enforce a settlement. Although the trial court conducted a lengthy evidentiary hearing in **Kramer**, we concluded that the proceedings were not the type from which post-trial motions are required. **Kramer**, 751 A.2d at 244.

**Bennett**, **supra** at 405-06. Thus, King argues that the trial court's evidentiary hearing was held under petition practice.

Driscoll counters that the evidentiary hearing was a trial and that he needed to file a post-trial motion to preserve his appellate issues. He also disputes that the hearing was governed by petition practice simply because King labeled his petition as such. For support, he notes that Pa.R.Civ.P. 206.1 defines a "petition" as either an application to strike or open or any other application designated by local rule (which there was none). Driscoll also emphasized that King raised no objection to his post-trial motion in his response.

- 6 -

After review, we decline to quash. First, looking at the discussion from **Bennett**, while our Supreme Court in **Coco Brothers** held that post-trial motions "[are] not required, or even permissible" from a trial court's order disposing of a petition to enforce a judgment, the order here did not dispose of a petition to enforce a judgment. Rather, the trial court's order here disposed of a petition to enforce a settlement. As for **Bennett** and **Kramer**, while both cases involved petitions to enforce a settlement, the procedural posture of those cases concerned applications to quash for waiver of reviewable issues based on the appellant's failure to file a post-trial motion. In both cases, we declined to quash. Here, in contrast, King asserts we must quash because Driscoll's notice of appeal is untimely, as no post-trial motions were required or permitted from the trial court's July 21, 2022 order. Thus, neither **Bennett** nor **Kramer** are analogous.

Second, we note that a panel of this Court dealt with a similar jurisdictional issue in **U.S. Home Corp. v Sinclair**, 249 A.3d 1165, 2021 WL 653236 (Pa. Super. Feb. 19, 2021) (unpublished memorandum). There, after the trial court granted a motion to enforce a settlement agreement, the appellant filed a motion for post-trial relief that was denied. On appeal, the panel noted that it did not appear that the appellant was required under Rule 227.1 to move for post-trial relief and should have instead appealed directly from the trial court's order resolving the motion to enforce settlement. **See U.S. Home Corp.**, **supra** at *3 n.3 (citing **Bennett**, **supra**). We also noted

that an unauthorized post-trial motion seldom tolls the appeal period. *Id*. (citing *Vietri ex rel. Vietri v. Delaware Valley High Sch.*, 63 A.3d 1281, 1288 (Pa. Super. 2013)).

That said, we found the appellant's filing of a post-trial motion rather than a notice of appeal did not require that we quash its appeal as untimely. As we explained:

> …as the propriety of [appellant's] post-trial motion was not raised by the parties or lower court, Rule 227.1 is silent as to whether a post-trial motion is required in this case, and our precedent does not directly address the effect on the timeliness of an appeal where a party files a post-trial motion from a ruling on a motion to enforce a settlement agreement, we decline to quash U.S. Home's appeal as untimely. *Cf. Newman Development Group of Pottstown, LLC v. Genuardi's Family Markets, Inc.*, 52 A.3d 1233, 1247-48 (Pa. 2012) (holding that appellate court should not impose "the heavy consequence of waiver" on a party due to non-compliance with Rule 227.1 unless the applicability of Rule 227.1 to the particular circumstance is "apparent upon its face or, failing that, in clear decisional law construing the Rule").

*U.S. Home Corp.*, *supra* at *3 n.3.

While *U.S. Home Corp.* is an unpublished memorandum, we find its reasoning persuasive.[4] First, like the appellee in that case, King raised no objection to Driscoll's motion for post-trial relief in his response to the motion, waiting instead until Driscoll filed this appeal to raise any issue with the propriety of the motion for post-trial relief. Second, it is unclear under Rule

---

[4] *See* Pa.R.A.P. 126(b) (providing that unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

227.1 whether a post-trial motion was required under these circumstances, especially because the procedural posture of the cases that King relies on— **Bennett** and **Kramer**—differ from that involved here. As there is unclear decisional law construing Rule 227.1 requiring quashal under these circumstances, we will not quash Driscoll's appeal.

## III.

On appeal, Driscoll raises two main arguments for why the trial court erred in concluding that the parties reached an agreement. First, he disputes that the attorneys' negotiations resulted in a binding, enforceable agreement. In particular, he focuses on the May 20th email that Attorney Conlon sent to Attorney Fuchs in response to the "redlined" draft of the agreement. In that email, Attorney Conlon wrote that he accepted most of Attorney Fuchs's changes and that he was sending the agreement to Driscoll for his review. Attorney Conlon, however, did not accept all of the changes, as he highlighted those with which he did not agree. Driscoll contends that this email shows not only that the attorneys had not yet agreed on all the necessary terms, but also that he had not yet approved the agreement.

Second, and related to the first part, Driscoll contends that he directed Attorney Conlon to obtain a copy of the restaurant's RRF application. Driscoll asserts that this was an essential part of the parties' negotiations and that he would not give his final approval to any agreement unless he first obtained and reviewed the application. Because he never received the application, he

never gave Attorney Conlon the express authority he would have needed to finalize the agreement.[5]

Our review of a trial court's decision to enforce a settlement agreement is well-settled:

> When reviewing a trial court's decision to enforce a settlement agreement, our scope of review is plenary as to questions of law, and we are free to draw our own inferences and reach our own conclusions from the facts as found by the court. However, we are only bound by the trial court's findings of fact which are supported by competent evidence. The prevailing party is entitled to have the evidence viewed in the light most favorable to its position. Thus, we will only overturn the trial court's decision when the factual findings of the court are against the weight of the evidence or its legal conclusions are erroneous.

*Salsman v. Brown*, 51 A.3d 892, 893–94 (Pa. Super. 2012) (citation omitted).

Settlement agreements are enforceable under Pennsylvania law even without a writing.

> Where a settlement agreement contains all of the requisites for a valid contract, a court must enforce the terms of the agreement. *McDonnell v. Ford Motor Co.*, ... 643 A.2d 1102, 1105 ( [Pa. Super.] 1994).... This is true even if the terms of the agreement are not yet formalized in writing. *Mazzella v. Koken*, ... 739 A.2d 531, 536 ( [Pa.] 1999); *see Commerce Bank/Pennsylvania v. First Union Nat. Bank*, 911 A.2d 133, 147 (Pa. Super. 2006) (stating "an agreement is binding if the

---

[5] Driscoll also argues that King admitted during his testimony at the evidentiary hearing that the parties never reached an agreement and that this constituted a judicial admission. However, as King points out, the full exchange shows that King meant that the parties never signed the agreement, not that the parties never reached an understanding of the terms of the agreement. *See* N.T., 12/20/21, at 80.

parties come to a meeting of the minds on all essential terms, even if they expect the agreement to be reduced to writing but that formality does not take place[ ]"). Pursuant to well-settled Pennsylvania law, oral agreements to settle are enforceable without a writing. ***Pulcinello***[ ***v. Consolidated Rail Corp.***, 784 A.2d 122, 124 (Pa. Super. 2001)] (citing ***Kazanjian v. New England Petroleum Corp.***, ... 480 A.2d 1153, 1157 ( [Pa. Super.] 1984)).

***Mastroni-Mucker***, ***supra*** at 517-18.

However, while the settlement agreement need not be reduced to writing, an attorney must still have authority to settle their client's case. Indeed, "[t]he ordinary employment of an attorney to represent a client with respect to litigation does not confer upon the attorney the implied or apparent authority to bind the client to a settlement or compromise, and the attorney cannot do so in the absence of such express authority." ***Baribault v. Zoning Hearing Bd. Of Haverford Twp.***, 236 A.3d 112, 122 (Pa. Cmwlth. 2020) (citations omitted).

Our Supreme Court explained this unambiguous rule as follows:

The law in this jurisdiction is clear and well-settled that an attorney must have express authority in order to bind a client to a settlement agreement. ***McLaughlin v. Monaghan***, 290 Pa. 74, 138 A. 79 (1927); ***Starling v. West Erie Ave. Bldg. & Loan Ass'n***, 333 Pa. 124, 3 A.2d 387 (1939); ***Archbishop v. Karlak***, 450 Pa. 535, 299 A.2d 294 (1973); ***Rizzo v. Haines***, 520 Pa. 484, 555 A.2d 58, 66 (1989). The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly. ***See***, ***e.g.***, ***Starling***, 3 A.2d at 388 ("apparent or implied authority does not extend to unauthorized acts which will result in the surrender of any substantial right of the client, or the imposition of new liabilities or burdens upon him"). As such, a client's attorney may not settle a case without the client's grant of express authority, and such express authority can only exist where the principal

- 11 -

specifically grants the agent the authority to perform a certain task on the principal's behalf. *See* Restatement (Second) of Agency § 7 cmt. c (1958).

*Reutzel v. Douglas, M.D.*, 870 A.2d 787, 791-92 (Pa. 2005). As a result, "if the existence of a settlement is in dispute because it is claimed that the attorney lacked authority to bind his client, the attorney's authority ... to bind [his] client by way of agreement or compromise is not inferred, but must be proven." *Brannam v. Reedy*, 906 A.2d 635, 640 (Pa. Cmwlth. 2006) (internal citation omitted).

In finding that the "[t]he accepted redline version in conjunction with the term sheet establish[ed] the essential terms of the agreement," the trial court never resolved what was the main factual dispute at trial—whether Attorney Conlon had Driscoll's express authority to settle the case. While we cannot say whether King proved that Attorney Conlon, in fact, possessed that authority—indeed, that determination belongs to the trial court—there was evidence at the evidentiary hearing that Driscoll never gave his attorney authority to settle the case.

As Driscoll highlights, that such authority was lacking is suggested by the May 20th email that Attorney Conlon sent to Attorney Fuchs in response to the "redline" draft of the agreement. In that email, Attorney Conlon indicated that he was sending the "redlined" draft of the agreement to Driscoll

"for his review."  R. 381.[6]  When asked about this email at trial, Attorney Conlon confirmed that he had to keep Driscoll updated on any advancement in the negotiations and forward him any drafts of settlement agreements.  ***See*** R. 246a.

Indeed, throughout his testimony, Attorney Conlon asserted that he did not have Driscoll's express authority to settle without his approval.  When asked why he drafted the agreements, he replied:

> I never got express authority to draft an – we were negotiating toward an agreement; we certainly were.  And something that I did as counsel for Mr. Driscoll was to draft an agreement.  I thought it was a way to move this forward.

R. 210a.  Attorney Conlon answered similarly when asked why he prepared the term sheet.

> Trying to make a deal, trying to show – isolate maybe those areas where we still need to discuss.  And those we don't need to discuss because we already discussed a lot, I'm trying to isolate them. Then, again, I did not have express authority to do this.  I'm just trying to move the negotiations forward.

R. 216a.

For his part, Driscoll confirmed much the same when he testified.

> Q.  Was Mr. Conlon authorized to negotiate a potential deal on your behalf?
>
> A.  Yes, he was.
>
> Q.  Did he, in fact, that you're aware of, work to negotiate a potential deal on your behalf?

---

[6] For ease of reference, we refer to the reproduced record.

A. Yes, he did.

Q. Was he required to communicate with you throughout these negotiations the details of any deal he attempted to negotiate on your behalf?

A. Yes, he was.

Q. Did he, in fact, do so?

A. Yes.

Q. Was he required to present draft documentation to you for your review throughout these negotiations?

A. Yes, he was.

Q. Did he, in fact, do so?

A. Yes.

Q. Was your express approval required for any agreements negotiated by Mr. Conlon on your behalf?

A. Yes, it was.

Q. And did you tell him that he needed your express approval before he could agree to any deals on your behalf?

A. Yes, I did.

Q. Did you ever grant Mr. Conlon authority to enter into a settlement agreement on your behalf without your express approval?

A. No, I did not.

Q. Did you ever grant Mr. Conlon authority to sign any agreements, settling agreements or other, on your behalf without your express approval?

A. No, I did not.

R. 312a-313a.

Driscoll was likewise unequivocal throughout his testimony that obtaining the restaurant's RRF application was a condition precedent to him signing off on any agreement negotiated by Attorney Conlon. For example:

> Q. And did you communicate to your counsel that you felt it was something necessary for the negotiations in this matter for you to see that RRF application?
>
> A. Yes.
>
> Q. Did you communicate to your counsel that that RRF application was something you needed to see in order to progress or conclude any settlement negotiations?
>
> A. Yes, I did.

R. 315a.

When asked the same about the May 20th version of the agreement that Attorney Conlon sent him, Driscoll testified that he would not agree to bound by the agreement unless he first saw the RRF application.

> Q. Did you accept the terms of this version of the membership interest purchase agreement?
>
> A. No, I did not.
>
> Q. Why not?
>
> A. Because we still had not received the RRF application.
>
> Q. As of May 20, 2021, now almost three weeks after the application was submitted, had you or your counsel received a copy of it?
>
> A. No, we had not. Did not.
>
> Q. Did you ever provide Mr. Conlon, at that point in time, with the express authority to accept [the May 20, 2021] draft of the membership interest purchase agreement attached to Exhibit 8?

A. No, I did not.

R. 319a. This was not an insignificant matter because it resulted in $370,000 coming into the business.

To recap, before it could conclude that the attorneys' negotiations led to an agreement, the trial court needed to first find that Attorney Conlon had Driscoll's express authority to bind his client to the terms of the agreement without first getting Driscoll's final approval. As part of such a finding, the trial court would have also needed to discredit Attorney Conlon's and Driscoll's claims that Driscoll being provided a copy of the RRF application was a condition precedent to any final agreement. As the above sampling of evidence shows, both Attorney Conlon and Driscoll unequivocally denied that such express authority was ever given. Unless King proved that Attorney Conlon in fact had such authority, then the trial court erred in finding that the parties, through merely the attorneys' exchange of drafts and negotiations, bound their clients to the agreement.

Accordingly, because this was a factual question to be resolved by the trial court, we will remand this matter for the trial court to determine within 60 days of the date of this memorandum whether King sustained his burden in proving that Attorney Conlon had express authority to settle the case though his negotiations with Attorney Fuchs.

Order reversed. Case remanded with instructions. Motion to quash denied. Jurisdiction retained.