J-A26031-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| RANDY L. GREEN AND PATRICIA L. GREEN, HUSBAND AND WIFE | : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : : | |
| v. | : : : | |
| | : | No. 367 WDA 2025 |
| JOHN BERG MEMORIAL, PA POST 976 D/B/A CROSBY AMERICAN LEGION #9/6, AND NORWICH TOWNSHIP VOLUNTEER FIREMAN'S ASSOCIATION, INC. A/K/A NORWICH TOWNSHIP VOLUNTEER FIRE DEPARTMENT | : : : : : : : | |

Appeal from the Order Entered March 20, 2025
In the Court of Common Pleas of McKean County Civil Division at No(s):
178 CD 2021

BEFORE:  OLSON, J., STABILE, J., and KING, J.

MEMORANDUM BY KING, J.:                    **FILED: December 19, 2025**

Appellants, Randy L. Green and Patricia L. Green, husband and wife, appeal from the order entered in the McKean County Court of Common Pleas, which granted in part the petition for enforcement of settlement agreement filed by Appellees, John Berg Memorial, PA Post 976 d/b/a Crosby American Legion #9/6 ("American Legion Post"), and Norwich Township Volunteer Fireman's Association, Inc., a/k/a Norwich Township Volunteer Fire Department ("Fire Department").  We affirm.

The relevant facts and procedural history of this appeal are as follows. This case involves an abandoned right-of-way in Norwich Township that was

previously held by a railroad. The right-of-way is bordered by properties owned by Appellants, American Legion Post, and Fire Department. On March 28, 2022, Appellants filed a complaint to commence an ejectment action against Appellees. At that time, Attorney Clarke represented Appellants.

By order entered April 19, 2023, the court referred the parties to mediation. On March 11, 2024, Appellees filed a motion for appointment of mediator. In it, Appellees averred that the parties were unable to agree on the mediator, and the local rules of civil procedure permitted the court to appoint the mediator under such circumstances. Without ruling on the motion, the court ordered the parties to appear for a settlement conference. The presiding jurist in the matter, the Honorable Christopher G. Hauser, presided over the settlement conference on April 17, 2024. Judge Hauser subsequently described how the parties reached an agreement at the conclusion of the conference:

> I had met with [Appellants] and their counsel, Mr. Clarke, one last time. I did not, at that juncture in time, expect that the matter was going to settle that day. And I outlined how I was going to proceed with the matter as my retirement was upcoming on April 30th. Essentially, what I advised the parties at that time was that I asked them to continue to try and resolve the matter. But if there wasn't a resolution by the time I retired, I was getting an order putting the matter on calendar for trial.
>
> I then went across the hall to another room and met with the fire department and the township representatives that were present, advised them of the same thing. And then just about before or during, Mr. Clarke came into the room and advised that he had a final offer to settle the matter. And my recollection of that offer was that there would be an

exchange of two parcels of land, that the sum of $35,000 would be required to be paid to [Appellants], and that there was to be an understanding … to a right-of-way, both as respect—or for [Appellants] as well as for the township, because they each—they had properties that they needed to access.

And there was to be, those matters were to be addressed in a survey that was to be prepared.

(N.T. Hearing, 2/24/25, at 14-15; R.R. at 442a-443a).

Judge Hauser tasked Appellees' counsel with preparing a written agreement with the relevant terms. On April 23, 2024, Appellees' counsel sent the draft agreement to Attorney Clarke. (**See** Petition for Enforcement of Settlement Agreement, filed 10/28/24, at ¶13; R.R. at 403a). Despite several follow-up communications, Attorney Clarke did not respond. On October 28, 2024, Appellees filed a petition for enforcement of settlement agreement. Appellees' petition detailed the parties' agreement from the settlement conference and explained that the parties had satisfied all outstanding issues. Appellees' petition for enforcement included a copy of the settlement agreement as an attachment. (**See id.** at Exhibit B; R.R. at 409a). The attachment included the following map, which depicted the boundaries of lands to be quitclaimed:



Exhibit B page 9

(**Id.**; R.R. at 417a).[1]  Consequently, Appellees asked the court to enter an order to enforce the settlement terms.

A new jurist conducted a hearing on the matter on February 24, 2025. At that time, Appellants appeared with current counsel.  The court received testimony from Mr. Green, Attorney Clarke, Judge Hauser, and representatives of Fire Department and American Legion Post.  By order entered February 25, 2025, the court granted Appellees' petition in part. Specifically, the court determined

> that the following issues have been agreed to and are hereby enforced:
>
> 1.    That [Appellees] shall pay [Appellants] $35,000.
>
> 2.    The parties will execute [quitclaim] deeds conveying what interest they may have, if any, in the two parcels to the other party.  The two parcels are adjacent to one another and the dividing line between the southside of [Appellees'] property and the northside of [Appellants'] property shall be the north line of the Pennsylvania General Energy ("PGE") roadway….[2]

---

[1] Appellees also submitted this map as Exhibit E at the February 24, 2025 evidentiary hearing.

[2] As depicted on the map, the disputed property includes an east-west roadway to provide access to State Route 46.  The parties refer to this feature as the "southern access road" or the "PGE right-of-way" throughout the record.  In the past, Appellants and Fire Department entered into separate agreements allowing PGE to use the road in conjunction with its operations. At the evidentiary hearing, however, Appellees presented a letter from PGE to Fire Department, dated October 1, 2024, indicating that PGE would no longer use the road.  (**See** Hearing Exhibit C; R.R. at 587a).

3.     [Appellants] will grant a right-of-way to the Fire Department over the southern access subject to the consent of PGE or the determination that PGE no longer has any interest in that access.

4.     The Fire Department shall obtain liability insurance covering the property at issue and providing a certificate of insurance indicating [Appellants] are protected by this insurance.

5.     [Appellees] shall be responsible for the obtaining and paying for a subdivision, preparation of [quitclaim] deeds, filing of [quitclaim] deeds, and any related expenses.

6.     There is an agreement that the parties will sign a mutual release as part of the agreement either as a separate document or incorporated into the main settlement agreement document.

With regard to the unresolved issues which are primarily the exact description of the property subject to the [quitclaim] deeds, the drafting of the right-of-way, and the determination of PGE's involvement or consent.  These issues must be resolved.

(Order, filed 2/25/25; R.R. at 419a) (unnecessary capitalization omitted).

Appellants filed a post-trial motion on March 7, 2025.  Appellants argued that the parties failed to agree to the material terms of the settlement agreement.  Moreover, Appellants claimed that Attorney Clarke lacked express authority to make the settlement offer.  The court denied Appellants' post-trial motion on March 20, 2025.  Appellants timely filed a notice of appeal on March 27, 2025.  On March 28, 2025, the court ordered Appellants to file a Pa.R.A.P. 1925(b) concise statement of matters complained of on appeal.  Appellants timely filed their Rule 1925(b) statement on April 10, 2025.

Appellants now raise two issues on appeal:

> Whether the trial court erred in enforcing a purported settlement agreement when the parties had not mutually assented to all material terms of the alleged settlement?

> Whether the trial court erred in enforcing a purported settlement agreement where Appellants' counsel lacked express authority from Appellants to bind them to any such agreement?

(Appellants' Brief at 7).

In their first issue, Appellants contend that the parties did not reach an agreement on at least two (2) material terms of the settlement. First, Appellants maintain that they did not agree to grant a right-of-way over their property to the Fire Department. Second, Appellants insist that the parties did not agree on the location of the boundary line that would separate the properties conveyed by the quitclaim deeds. Appellants argue that "[t]he lack of consensus on such terms means the parties had, at most, an agreement to negotiate further or an 'agreement to agree,' which is not an enforceable contract under Pennsylvania law." (*Id.* at 19). Appellants conclude that the trial court erred in enforcing the settlement agreement because the parties never reached a meeting of the minds on essential terms. We disagree.

"The enforceability of settlement agreements is determined according to principles of contract law. Because contract interpretation is a question of law, this Court is not bound by the trial court's interpretation." *Step Plan Services, Inc. v. Koresko*, 12 A.3d 401, 408 (Pa.Super. 2010) (quoting *Mastroni-Mucker v. Allstate Ins. Co.*, 976 A.2d 510, 517-18 (Pa.Super.

- 7 -

2009)).

> Our standard of review over questions of law is *de novo* and to the extent necessary, the scope of our review is plenary as the appellate court may review the entire record in making its decision. With respect to factual conclusions, we may reverse the trial court only if its findings of fact are predicated on an error of law or are unsupported by competent evidence in the record.

*Id.* (internal citations and quotation marks omitted).

"There is a strong judicial policy in favor of voluntarily settling lawsuits." *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 946 (Pa.Super. 2004). "The primary reason that settlement is favored is that it expedites the transfer of money into the hands of a complainant. Further, settlement reduces the burden on and expense of maintaining courts." *Id.* (internal citations omitted).

In a settlement agreement, "[t]here is an offer (the settlement figure), acceptance, and consideration (in exchange for the plaintiff terminating his lawsuit, the defendant will pay the plaintiff the agreed upon sum)." *Step Plan Services, supra* at 409 (citation omitted). "As with any contract, it is essential to the enforceability of a settlement agreement that the minds of the parties should meet upon all the terms, as well as the subject-matter, of the agreement." *Mazzella v. Koken*, 559 Pa. 216, 224, 739 A.2d 531, 536 (1999) (internal citation and quotation marks omitted).

> If parties agree upon essential terms and intend them to be binding, a contract is formed even though they intend to adopt a formal document with additional terms at a later date. The intent of the parties is a question of fact which

must be determined by the factfinder…. A reviewing court must defer to the findings of the trier of the facts if they are supported by the evidence….

*Compu Forms Control, Inc. v. Altus Group, Inc.*, 574 A.2d 618, 622 (Pa.Super. 1990) (internal citations and quotation marks omitted). *See also Toppy v. Passage Bio, Inc.*, 285 A.3d 672, 682 (Pa.Super. 2022) (stating "courts also will enforce informal agreements that are missing 'material' terms so long as the parties agree on the essential terms").

Instantly, the trial court conducted an evidentiary hearing to determine whether the parties agreed upon the essential terms of the settlement agreement. At the start of the hearing, Judge Hauser unequivocally testified that he believed that the matter had settled:

> Again, I left the meeting believing that the matter had been settled. I returned to my chambers the following day, and marked my calendar to follow up on the settlement agreement. I sent an email, or I think I sent several emails, actually, to both [Appellees' counsel] and to Mr. Clarke, asking where the agreement was, so that I could enter an order on the record before I retired, collecting the settlement. No such order—no settlement agreement came. Mr. Clarke never replied to any of my emails. And when I left, I entered an order right prior to my departure, putting the matter on track for trial.

(N.T. Hearing at 16; R.R. at 444a). Judge Hauser also testified that the breakthrough in negotiations came when Attorney Clarke presented Appellants' request for $35,000 in compensation:

> That was the number that Mr. Clarke laid out. He said—I specifically remember this because I did not think the matter was going to settle. So when Mr. Clarke came back in the room and said, my clients will take $35,000 and laid

out a couple other conditions, that was my recollection.

(*Id.* at 19; R.R. at 447a).

Judge Hauser characterized the unresolved details as "loose ends" that did not impact the settlement in principle:

> I know there were a couple of loose ends. There was an issue regarding ownership of the railroad grade right-of-way. There was this [PGE] right-of-way. And there was a right-of-way or rights-of-way, I don't recall whether it was one or two, regarding access to property that was to the back of—this property fronts on the road. There was property behind that property that had to be accessed. And [Appellants] had an access, I think it was on the south end of the parcel. They had an access into the back property there. And I think the fire department may have had an access up on the north end of the property. They had access to the lands that I think they had back on the north side. And so, they wanted to make sure that they both had—continued to have that access.

(*Id.* at 20; R.R. at 448a).

Appellees' additional witnesses corroborated Judge Hauser's testimony while also establishing the parties' agreement on all essential terms. Edward Hairston, II, past president of Fire Department, testified about Appellants' agreement to grant a right-of-way over their property to Fire Department, and he also detailed the approximate location of the boundary lines that would separate the properties conveyed by the quitclaim deeds. Specifically, Mr. Hairston provided the following responses on direct examination:

> [COUNSEL:] Okay. Now, let's talk about the, what you refer to as property swap. Can you describe what each of the parties was to get in terms of property?
>
> [WITNESS:] We would get everything from the …

southern entranceway back to the other entranceway. And then [Appellants] would get the small piece in behind from the southern entranceway back to their property.

[COUNSEL:] Okay. So who would actually get ownership of the southern access road?

[WITNESS:] The access point would actually have gone to [Appellants] with the understanding that the fire department would have full lifetime access.

[COUNSEL:] Okay. Over that southern access road?

[WITNESS:] Yes.

[COUNSEL:] Okay. So if we're looking at Exhibit B, just making sure I understand correctly, we see the boundaries of the southern access roadway. You said that the fire department would get ownership from the northern boundary of that access road?

[WITNESS:] Yes, sir.

[COUNSEL:] And running thence north to the other—the northern access route?

[WITNESS:] Yes, sir.

(*Id.* at 33-34). Regarding the right-of-way over the access road, Mr. Hairston added that Fire Department needed to use the road because it was a "[s]afer in and out means of travel." (*Id.* at 35; R.R. at 463a).

Andrew Angell, Fire Department's vice president and second assistant chief, echoed Mr. Hairston's testimony about the proposed right-of-way and boundary lines.

[COUNSEL:] Now, you talked about some land exchange. Do you recall what land was to be exchanged?

[WITNESS:] There's an area that is kind of square off

- 11 -

[Appellants'] property along that southern access road in exchange for everything to the northern side of that access road. I don't remember the exact sizes or anything like that.

[COUNSEL:]  Do you remember who was to receive what?

[WITNESS:]  [Appellants] would receive the piece south of the access road, and the fire department would receive that north of the access road.

[COUNSEL:]  Okay.  Was there any—do you recall any terms that related to use of the access road?

[WITNESS:]  The fire department would have right-of-way over that access road to our parcel out behind it.

(*Id.* at 48; R.R. at 476a).  Mr. Angell also recalled that Appellants agreed to Fire Department's right-of-way over the access road earlier in the day, before the parties agreed on the amount that Appellees would pay Appellants.  (*See id.* at 50; R.R. at 478a).

Appellees also presented testimony from Francis Doutt, the commander in charge of American Legion Post.  Mr. Doutt reiterated that Appellees agreed to pay Appellants $35,000 "to end this, to finalize this here so we can move on." (*Id.* at 56; R.R. at 484a).  In addition to the $35,000 payment, Mr. Doutt described the land exchange as follows:

Well, they'd use a phrase of quitclaim deeds on two parcels of property.  And we'd just switch the two over, which we'd agreed upon that.  And [Appellees' counsel was] going to write it up to have that parcel switched over.  The parcel with the parking area to the north of the access line.  And then we would deed the southern half of the parcel that adjoins [Appellants'] property.

(*Id.*)  Mr. Doutt also noted that "the fire hall would have full-time access" to

the southern access road. (*Id.*)

Finally, Attorney Clarke confirmed the boundary lines as follows:

> [Appellants] would be conveying a portion of their property lying just north of the [PGE] right-of-way. We were going to have to work out what that distance was going to be because we assumed that [PGE] would want some buffer.
>
> *    *    *
>
> [M]y thought was that we were going to be looking at a conveyance of a parcel that was a line drawn, have to be surveyed consistent with whatever [PGE] thought was appropriate just north of their right-of-way and running north to [Appellants'] boundary line[.]

(*Id.* at 77-78; R.R. at 505a-506a). At the conclusion of Attorney Clarke's testimony regarding the boundary lines, the court interjected:

> THE COURT: So the question was, the understanding was, at the end of the day, your clients were going to get a parcel, the fire department was going to get a parcel, each side would quitclaim whatever interest they had to the other. If someone else had an interest, that wasn't the issue before you. So … it sounds like you are saying, sure, we discussed quitclaim deeds.
>
> THE WITNESS: We did.
>
> THE COURT: And getting a parcel. Okay.
>
> THE WITNESS: Yes.

(*Id.* at 85; R.R. at 513a). Importantly, Attorney Clarke also confirmed that he had informed Appellees that Appellants would grant Fire Department's

- 13 -

request for a right-of-way over the southern access road.[3]  (*See id.* at 87;

R.R. at 515a).

Based upon the foregoing, the court found that Appellees had

demonstrated the parties' agreement upon the essential terms and an intent

to be bound by those terms:

> [Appellees] met their burden of proof and established that
> there was an agreement to a certain extent, although there
> are still some loose ends that I can't resolve based on the
> state of the record, and that the parties still need to resolve.
>
> When the parties left the [settlement] conference and were
> to work on the, whatever you want to call them, the
> contingencies, the loose ends, the final language, in my
> mind there's an implication that the parties will act in good
> faith.  They will negotiate.  They will discuss.  They will
> communicate.  There was a failure on [Appellants'] part to
> do that.

(*Id.* at 144-45; R.R. at 572a-573a).

Here, the parties' agreement revolved around three essential terms: 1)

the exchange of quitclaim deeds for specific portions of the disputed property;

---

[3] Earlier, Attorney Clarke explained that Appellants would not provide **American Legion Post** with a right-of-way:

> You know, when I made that offer, I did not have the
> authority to offer anything to the Legion.  That was their
> sticking point.  And any right-of-way that went to the fire
> hall had to be cleared through [PGE] as to what, when,
> where, how, maintenance, upkeep, that sort of thing.

(N.T. Hearing at 65; R.R. at 493a).  Further, Appellants were concerned "about the Legion's patrons, you know, driving across that" access road because "some of their patrons are drinking alcohol."  (*Id.* at 64; R.R. at 492a).

2) Appellees' payment of $35,000 to Appellants; and 3) Appellants providing a permanent right-of-way to Fire Department. Appellees' witnesses testified that the parties agreed upon these terms at the settlement conference. To the extent Appellants now rely on Mr. Green's self-serving testimony to the contrary, the court specifically found Appellees' witnesses to be credible. (**See** N.T. Hearing at 143; R.R. at 571a). The record supports the court's findings, and we defer to those findings. **See Compu Forms Control, supra**. Therefore, the court properly determined that the parties came to a meeting of the minds for all essential terms, and the settlement agreement was enforceable. **See Mazzella, supra**.

In their second issue, Appellants assert that "Attorney Clarke lacked the requisite authority from his clients to conclude a binding agreement." (Appellants' Brief at 22). Appellants insist that they "never gave their attorney permission to settle the case by granting a right-of-way across their land or by accepting the specific boundary line later enforced by the [trial] court." (**Id.** at 23-24). "Absent express authority from [Appellants], Attorney Clarke's representations could not bind them." (**Id.** at 24). Appellants conclude that the trial court erred in enforcing the settlement agreement because Attorney Clarke lacked express authority to bind Appellants to the settlement agreement. We disagree.

"[W]hile the settlement agreement need not be reduced to writing, an attorney must still have authority to settle their client's case." **King v.**

***Driscoll***, 296 A.3d 1178, 1184 (Pa.Super. 2023).

> Indeed, the ordinary employment of an attorney to represent a client with respect to litigation does not confer upon the attorney the implied or apparent authority to bind the client to a settlement or compromise, and the attorney cannot do so in the absence of such express authority.
>
> Our Supreme Court explained this unambiguous rule as follows:
>
>> The law in this jurisdiction is clear and well-settled that an attorney must have express authority in order to bind a client to a settlement agreement. The rationale for this rule stems from the fact that parties settling legal disputes forfeit substantial legal rights, and such rights should only be forfeited knowingly. As such, a client's attorney may not settle a case without the client's grant of express authority, and such express authority can only exist where the principal specifically grants the agent the authority to perform a certain task on the principal's behalf.
>
> As a result, if the existence of a settlement is in dispute because it is claimed that the attorney lacked authority to bind his client, the attorney's authority … to bind his client by way of agreement or compromise is not inferred, but must be proven.

***Id.*** (internal citations and quotation marks omitted).

Instantly, Appellees' counsel questioned Attorney Clarke about express authority as follows:

> [COUNSEL:] So ultimately, at the time you came and presented [Appellants'] offer to the fire department and to the Legion, did you have authority from [Appellants] to present that offer?
>
> [WITNESS:] Yeah, that's kind of a loaded question. I'll try to answer it this way, yes, I had some authority to go in and talk to you. They were adamant they didn't want to give a right-of-way to the Legion. That became a sticking issue in

- 16 -

> the process, and you and I went back and forth on this several times. So yes, I had the authority to go in and try to work out this agreement, yes.
>
> [COUNSEL:] And did you, in fact, make an offer on behalf of [Appellants]?
>
> [WITNESS:] Short answer, yes. We offered the—again, you said 35,000. My memory tells me it was over 30, I'll go with 35.
>
> * * *

(N.T. Hearing at 65; R.R. at 493a). Judge Hauser also testified that Attorney Clarke represented that he had authority from Appellants to make the final offer. (*See id.* at 23; R.R. at 451a).

> Later, Appellants' counsel attempted to muddy the waters on this topic:
>
> [COUNSEL:] Okay. Attorney Clarke, did [Appellants] ever give you blanket authority to bind them to any settlement agreement?
>
> [WITNESS:] You know, that's the ultimate question going to the judge. We were negotiating. I made the offers they allowed me to make. I would say to you that the 35,000 was a solid. It actually—we started off—we went back and forth on the number, and that's where we ended.

(*Id.* at 89; R.R. at 517a).

Although Attorney Clarke attempted to qualify his answer by saying that he "made the offers they allowed me to make," the record demonstrates that Appellants gave Attorney Clarke express authority to seek a $35,000 payment from Appellees. As we have previously discussed, the parties already agreed to the approximate boundary lines for the property exchange, as well as Fire Department's right-of-way over the access road. Thus, Appellants' grant of

express authority to Attorney Clarke to seek the $35,000 payment amounted to the authority necessary to settle the case, which hinged upon the payment amount. On this record, adequate evidence supported the court's finding that Appellants provided Attorney Clarke with express authority to act on their behalf. ***See King, supra***. Accordingly, we affirm the order granting in part Appellees' petition for enforcement of settlement agreement.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 12/19/2025